LUCILLE ADDIS, Appellee, v. C. F. APPLEGATE, Appellant.

HABEAS CORPUS: Application for Writ—Venue—''Judge Most
1   Convenient in Point of Distance.'' One seeking to test the legal-
    ity of his imprisonment by habeas corpus may consult his own
    convenience as to the venue by applying for the writ to *any*
    district judge of the state (Sec. 4419, Code, 1897), howsoever re-
    mote such judge may be from the place of imprisonment, alleging
    that such judge is the ''most convenient in point of distance''

*to him* (Sec. 4420, Code, 1897), even though there may be other judges nearer in point of distance to such place of imprisonment; and if such judge deems the application sufficient, even erroneously, he has jurisdiction to issue and determine a writ running into any part of the state.

**HABEAS CORPUS:** Issuance of Writ—Public Officers. When a writ
2 of habeas corpus is leveled at a public officer, his official character neither enlarges nor abridges his rights. (But now see, as bearing thereon, Sec. 4420, Code, 1897, as amended by Ch. 293, Acts 35 G. A.)

**HABEAS CORPUS:** Venue—Habeas Corpus Statutes Exclusive—General Statutes Not Applicable. The venue in an action for a writ
3 of habeas corpus is exclusively governed by Secs. 4419, 4420, Code, 1897. The provisions of Secs. 3494, Code Sup., 1907, 3504, Code, 1897, governing, generally, the procedure when actions are brought in the wrong county and when actions involve acts done by virtue of a public office, in no manner control the venue in habeas corpus.

**HABEAS CORPUS:** "Inebriate" Act—Commitment "Until Cured"
4 —Power of Court to Determine Question of Cure—Parole. When, under the Hospital for Inebriates Act, the commitment of an inebriate was, under Sec. 2310-a12, Sup. Code, 1907, "until cured, and not exceeding three years," the court or judge on habeas corpus proceeding may determine whether or not the patient is *cured*, irrespective of the discretionary power of the board of control to discharge (Sec. 2310-a12, Sup. Code, 1907), and irrespective of the power or duty of the governor to parole patients. (Sec. 2310-a3, Sup. Code, 1907.)

**APPEAL AND ERROR:** Habeas Corpus—Appeal Not Heard De
5 Novo. An appeal in habeas corpus is not heard *de novo*. A finding of fact by the trial judge will be treated as the finding of a jury.

**HABEAS CORPUS:** Right to Writ Irrespective of Statute—"Inebriate" Act. The right to the writ of habeas corpus is always
6 present and available, not by virtue of any statute, but by virtue of the Constitution. (Sec. 13, Art. I.) Along with the right to demand the writ, under permissible regulations of law, and along with the right and duty of the court or judge to issue the writ, in a proper case, goes the right to determine every matter of fact upon which the legality of the imprisonment depends. Under the Inebriate Act, and under a commitment "until cured and not exceeding three years," *held* that the superintendent of

the hospital did not have the exclusive right (Sec. 2310-a3, Sup. Code, 1907) to determine when the patient was cured, and that such question could be determined on habeas corpus.

LADD, J., concurs in first division of opinion, dissents as to second division.

DEEMER, C. J., and PRESTON, J., dissent.

*Appeal from Clayton District Court.*—HON. W. J. SPRINGER, Judge.

TUESDAY, SEPTEMBER 21, 1915.

PLAINTIFF, being confined as an inebriate in the Hospital for Insane at Mt. Pleasant, applied to Hon. W. J. Springer, one of the judges of the district court of Clayton county, for a writ of habeas corpus, alleging that she had been cured, and was entitled to her liberty, and was being illegally restrained. The judge issued the writ and the plaintiff was brought before him for hearing. The defendant, superintendent of the hospital, moved to quash the writ, on the ground that the application was not made to a judge most convenient in point of distance to the applicant. This was overruled. Thereupon he filed a motion for a change of venue, which was also overruled. Thereupon the defendant filed answer and return to the writ, denying that the plaintiff was cured, and alleging that the judge before whom the proceedings were instituted had no right or authority to determine the question as to whether she was cured or not. Judgment was entered for the plaintiff, and she was discharged. Defendant appeals.— *Affirmed.*

*George Cosson,* Attorney General, and *C. A. Robbins,* Assistant Attorney General, for appellant.

*J. A. Hanley,* for appellee.

GAYNOR, J.—Division I. On the 29th day of April, 1911, the plaintiff was adjudged to be a fit subject for detention and

treatment at the Iowa State Hospital for Females at Mt. Pleas-
ant, as an inebriate. The order for her de-
tention was made by the district court of
Clayton county, and provided that she be com-
mitted to and detained in said hospital *until
cured, not exceeding three years.* It was made
to appear at said hearing that she was addicted to the exces-
sive use of morphine. No question is made about the propriety
or sufficiency of the order of commitment, or the proceedings
under which the order was made. Nor is there any claim that
she was not at that time a fit subject for detention in the hos-
pital for inebriates. The order for her detention was issued
to the sheriff of Clayton county, commanding him to deliver
her, without delay, to the superintendent of the Hospital for
Inebriates at Mt. Pleasant, and this was accordingly done.
The defendant herein, C. F. Applegate, was at the time, and
is now, the superintendent of the hospital, and he received
her and took her into his custody under and by virtue of such
order, and was so detaining her at the time this action was
commenced.

On the 18th day of August, 1912, the plaintiff filed a
petition for writ of habeas corpus before Hon. W. J. Springer,
one of the judges of the district court in and for Clayton
county, this being the county in which the judgment of com-
mitment was entered, and the one in which she then resided.
The application for the writ of habeas corpus states, and the
fact appears to be, that she was committed to the care of the
defendant on the 2d day of May, 1911, under said order for
treatment. It is claimed that plaintiff is entirely cured of the
morphine habit; that the defendant herein, the superintendent
of the hospital, knowing that she is cured, refuses to restore
her to her liberty or to discharge her from his custody, and
that, therefore, her further confinement and custody in said
hospital and her further restraint by the defendant are illegal.
Plaintiff further alleges, in her application for the writ, as a
reason for not making application to the nearest court or

1. HABEAS COR-
PUS: applica-
tion for writ:
venue: "judge
most conven-
ient in point
of distance."

judge, that the judge to whom the application was made was most convenient, in that she can procure testimony at the time of hearing to much better advantage and with less expense than can be done in any other county in the state. There are other allegations in the application for the writ which are not material to this controversy, and are not, therefore, set out.

Upon the filing of the petition aforesaid, Hon. W. J. Springer, on the 18th day of August, 1912, ordered that a writ issue in due form, as provided by Sec. 4423 of the Code, commanding this defendant to bring the plaintiff before him on the 17th day of September, 1912, at the hour of 9 o'clock A. M., to be dealt with according to law. On said date, the defendant herein appeared before said judge and filed the following motion, which was, on the same day, overruled:

"Comes now the defendant in the above entitled cause and moves the court to dismiss the petition of plaintiff filed herein and to remand the plaintiff to the custody of the defendant for the following reasons:

"1st. It appears by the allegations of said petition that the plaintiff was, at the time of the filing of said petition, confined at the State Hospital for Female Inebriates at Mt. Pleasant, in Henry county, Iowa, and it is not shown that said petition was presented to the court or judge most convenient to the applicant from the point of distance, as required by Sec. 4420 of the Code; nor is said action brought in the county where the cause arose, as required by Code Sec. 3494.

"2d. For the reason that this court has no jurisdiction to issue the writ of habeas corpus issued herein, because the judges of the district court of the judicial district in which Henry county is situated were, at the time said petition was filed and said writ issued, most convenient to the applicant in the point of distance."

Thereupon the defendant filed a motion for a change of venue from Clayton county to Henry county, supported by

the affidavit of the defendant, in which he states that he is an actual resident of Henry county; superintendent of the Hospital for Females at Mt. Pleasant; that his official acts are performed in Henry county; that he was a resident of said county at the time the action was commenced; that the only restraint of the plaintiff made by him is as superintendent of the hospital, and at said institution. This motion being overruled, the defendant made his return to the writ, in which he admits the commitment and confinement of the plaintiff at the times and places alleged in her application, and further challenges the jurisdiction of Judge Springer to issue the writ, or to try, hear, or determine the issues involved; alleges that there are two judges of the district court, one residing in Mt. Pleasant, where plaintiff is confined, and one residing in Burlington, both of whom are more convenient in point of distance to the applicant than is Hon. W. J. Springer. Upon the filing of the said return, the defendant asked that plaintiff's petition be dismissed; that she be remanded to his custody, to be detained by him in obedience to the writ of commitment. Thereupon the cause proceeded to trial upon the issues joined, and, upon such hearing, the plaintiff was discharged. From the action of Judge Springer in the premises, the defendant appeals, and assigns as error:

1. The court erred in overruling defendant's motion to dismiss and remand.

2. The court erred in overruling defendant's motion for a change of venue.

3. The court erred in assuming the power to determine the question of fact as to whether or not the plaintiff is cured, when this was solely a question to be determined by the superintendent of the inebriate department of the hospital.

We shall consider these assignments in the order in which they were made.

Division I. Did the court err in overruling the defendant's motion to dismiss and remand?

Section 4420 of the Code provides:

"Application for the writ must be made to the court or judge most convenient in point of distance to the applicant, and the more remote court or judge, if applied to therefor, *may* refuse the same, unless a sufficient reason be stated in the petition for not making the application to the more convenient court or a judge thereof."

The Supreme Court of this state, the district courts and the superior courts, and each and every judge of each and every one of these courts has jurisdiction to entertain an application for a writ of habeas corpus and to allow the writ upon a proper showing, and the writ, when issued, "may be served *in any part of the state.*" Section 4419 of the Code. We start, then, with the proposition that each of the district judges of this state is, by virtue of the statute, invested with the power to entertain an inquisition of this character, and, upon proper application, to issue a writ, which, when issued, may be served upon anyone within the limits of the state. Section 4420 puts some limitation upon the exercise of the power so invested, in so far as it says that the "application for the writ must be made to the court or judge most convenient in point of distance to the applicant." It does not say, however, that a more remote judge, if applied to, may not issue the writ upon a showing that a citizen of the state is illegally deprived of his liberty. It does not assume to take from the more remote judge the jurisdiction given him under and by virtue of the provisions of Sec. 4419, but says that he *may* refuse to grant the writ "unless a sufficient reason be stated in the petition for not making the application to the more convenient court or a judge thereof." The statute does not define what is meant by "a more convenient court or judge," unless we infer, from what precedes, that it was intended by the legislature to mean in point of distance. The statute does not say that the application shall be made to the judge *nearest* in point of distance to the applicant, but to the one "*most convenient* in point of distance."

It has been held by this court that the applicant referred to in the statute is the party restrained of his liberty. Therefore it follows that the writ must be applied for to a judge most convenient in point of distance to the party restrained of his liberty. The thought of the legislature seems to be that the convenience of the party restrained is the controlling factor in the selection of the judge. In the application in this case, it was asserted by the applicant that Judge Springer, to whom the application was made, was more convenient to the applicant in point of distance. This allegation was based upon the alleged reason that a hearing before him would be more convenient, in that the testimony upon the hearing could be procured with less expense, and to much better advantage, than could be done in any other county in the state. The application, therefore, tendered a question of fact, upon which the judge was called upon to act, and upon the proof of which rested his right to grant or refuse the writ. In assuming jurisdiction, he must have found this allegation to be true. He must have found affirmatively that it was more convenient to the applicant in point of distance to make the application to him, than to a judge nearer in point of distance.

Cases may arise in which this is absolutely true, and the court, in passing upon the application, in a fair consideration of all conditions, might readily so determine. His determination of this question is made upon the allegations of the application. Does the fact, if it be a fact, that upon a hearing in this court it appears that his determination was not well founded, or that he erred in his determination upon this question, oust him of jurisdiction? The Constitution of this state recognizes the writ of habeas corpus as an existing remedy in all cases in which it is properly applied for. The statute herein set out designates the courts or officers which may issue a writ. The statute does not attempt to point out, nor could it conveniently do so, all the cases in which the writ may be applied for or used. The proceeding is in the nature of an inquisition—to inquire into and determine, upon proper

application, whether the party complaining is or is not unlawfully restrained of his liberty. The right to the writ antedates our Constitution and our statute. They attempt only to reassert the right and to maintain it inviolate, regulating, however, the manner of its use. We are, therefore, compelled to look to the common law, the statutes of the state and the decisions of the courts, to determine the cases in which the right may be employed and the manner in which the right to the writ may be exercised.

The primary question, in all proceedings of this kind, is whether or not the applicant is illegally restrained of his liberty at the time the application is made. It is immaterial, so far as the right to the writ is concerned, whether or not he was originally restrained by criminal or civil process. The question to be determined upon the hearing is, Is he now lawfully or unlawfully restrained?

The writ may be applied for and secured upon the application of the person confined, or the application may be made on his behalf by another, or the writ may be issued by the court on its own motion in a proper case.

To entitle the applicant to the writ, there must be at least a prima-facie showing made in the application that the detention or confinement of the applicant is unlawful. Without such prima-facie showing in the application itself, the writ ought to be denied. This court, in the case of *Ware v. Sanders*, 146 Iowa 233, 240, speaking through Judge Weaver, said:

"Both by motion and in argument counsel for the State attack the jurisdiction of this court to entertain or pass upon plaintiff's petition, because the application for the writ was not made to the court or judge most convenient to the petitioner, as provided by Code Sec. 4420. While the section referred to provides a general rule directing the application to be made to the most convenient judge, it does not expressly provide that such judge has exclusive jurisdiction, nor does

it command the more remote judge to whom it may be presented to refuse the writ, but the language is that he 'may refuse the same.' The phrase 'convenient in point of distance' is one of quite indefinite meaning, and often might reasonably be applied to any one of several judges residing in different localities. The statutory restriction serves to put the judge upon his guard, and suggest inquiry into the propriety of his entertaining the proceeding and the good faith of the applicant in coming to him, but we think it is not a jurisdictional question. If, as is provided in some states, the statute required the matter to be first presented to a judge of the county or district where the plaintiff is restrained, an objection to an application first made elsewhere would raise a very different question; for, in such case, a territorial limit is clearly and explicitly defined, and no room is left for construction.''

This language is in point here. The same issue was tendered there as is tendered here, and the decision sustained the right of a more remote court or judge to assume jurisdiction and determine the controversy there.

It will be further noted that the statute says the application must be made to the judge "*most convenient* in point of distance to the applicant.'' The convenience of the applicant seems to be the controlling thought of the legislature in the selection of the judge. There is nothing in the statute indicating that the legislature intended that the convenience of the party charged with the illegal restraint should be considered. It therefore occurs to the mind that it is not a matter of which he can complain if the application is made to one, though not convenient to him, who is alleged to be and claimed to be, convenient to the applicant. The question of convenience to the applicant is a matter that affects him alone, and if it is inconvenient for him to select a remoter judge, it is not for the other party to make complaint. No right is given defendant to select, nor is his convenience provided for in the statute.

There is no doubt that this provision of the statute is advisedly there, giving the judge the right to refuse to entertain the writ, if, in his judgment, it ought to be made to one more convenient to the place where the applicant is confined. Cases may arise in which it would be a great hardship to require one applying for a writ on behalf of the one restrained of his liberty to make application to the judge nearest to the place of confinement. For instance, in cases of children, where there is a separation of parties and the wife is given the control and custody of the child and has a right to the possession of it, and the father wrongfully removes it to some remote corner of the state, and there restrains it of its liberty, and denies the wife's right to the possession; if, under such a supposable case, and one that may often arise, the wife should apply, on behalf of the child, for a writ of habeas corpus to the judge residing in the county from which the child was taken, and it should be made to appear that all the witnesses who were material to the proper determination of the rights of the parties to the possession of the child were residing in that county and were most convenient and accessible and most easily procured and with less expense upon a hearing there, and the judge should so find and issue the writ, could the party against whom the writ issues be heard to say: ''True, I have wrongfully taken the child from the possession of the applicant and am wrongfully restraining him, but inasmuch as I have removed him to a remote corner of the state, and hold him in my possession there, and was so holding him at the time this writ was issued, the writ ought to be quashed as improvidently issued, because the application was not made to a judge most convenient, in point of distance, to the place where I was then unlawfully restraining the applicant of his liberty?'' To hold that would be to say that it was the purpose and intention of the legislature that 'the convenience of the wrongdoer should be considered, rather than the convenience of the one who is seeking the

liberty of which he is alleged to be wrongfully deprived. The statute does not so provide.

It is true that in this case, the applicant was originally rightfully in the possession of the defendant, and rightfully restrained of her liberty by him, because her restraint was secured, and authority to restrain given, under due process of law. But however rightful the original restraint may be, however right the restraint in its inception may have been, it may become wrongful, and the right to restrain may terminate by the happening of subsequent conditions, or by the operation of the law itself upon the rights of the parties, and the question in all these cases is not whether the original restraint was rightful, but whether or not, at the time of filing the application for the writ, the applicant is wrongfully restrained of liberty, and this must be determined by the then conditions.

From what has been heretofore said, it is apparent to us that Judge Springer, who issued the writ in this case, had jurisdiction to issue the writ which the defendant sought, by his motion, to quash, and that there was no error in the court's ruling on that point. As bearing upon this question, see *Broomhead v. Chisolm*, 47 Ga. 390. This case, though not exactly in point upon the question here raised, suggests, at least, the correctness of our conclusion. See also *Simmons v. Georgia Iron & Coal Co.*, 61 L. R. A. 739 (43 S. E. 780); *Anderson v. Culver et al.*, 3 Practice Reports (Can.) 306.

The fact that the defendant was a public officer did not render him immune from inquisition of this kind, and his official character neither enlarged nor abridged his rights.

2. HABEAS COR-
PUS: issuance
of writ: public
officers.

Most of the cases of this character that have come before the courts for determination were cases in which the party complaining was held under pretense of official authority, or under some claimed legal right to make the restraint. It does not make any difference by what authority the original restraint is made; for, when the writ is issued, it is the duty of the party

against whom the writ runs to obey the same and bring before the judge the party alleged to have been illegally restrained, to explain and justify, if he can, the fact of restraint or imprisonment. The very purpose and object of the remedy is to give speedy and effective relief to those who are deprived of their liberty wrongfully, no matter by whom, or under what claim the imprisonment is made. The application is made originally for the sole purpose of compelling the person against whom it runs to produce before the court or judge the body of the person claimed to have been illegally restrained, in order that the cause of his detention may be inquired into. Where a public officer is charged with restraining one wrongfully of his liberty, and a writ issues, he must produce before the court, in obedience to the writ, the person alleged to have been wrongfully restrained. So far as the proceeding in habeas corpus is concerned, his responsibility ceases when he has done this. This court then passes upon all questions, both of law and fact, and determines the ultimate question whether the person is or is not wrongfully restrained of his liberty. The proceeding is instituted and carried on for his benefit. The officer presumably is not personally interested in the outcome. It is not, in a technical sense, a suit between the applicant and the officer, and the officer is not liable for costs in this proceeding, nor can he be mulcted in damages, even though it be made to appear that the restraint is wrongful. The proceeding is simply to fix the status and rights of the applicant, his right to liberty or otherwise; and if it appears that he was wrongfully restrained, he must be discharged. As stated by Mr. Justice Bleckley in *Perry v. McLendon*, 62 Georgia 598, 604:

"The writ should be issued, providing the petition contains the requisite matter, is in due form, duly authenticated, duly presented, and does not show on its face that the imprisonment, though complained of as illegal, is in fact legal."

It would seem, therefore, that it is the duty of the court or judge to whom the application is presented, before issuing the writ, to inspect the application to see if it contains sufficient averments, is in due form of law, and properly subscribed. If it does not, he should refuse to issue the writ. If it does, it is his duty to grant it. In *Simmons v. Georgia Iron & Coal Co., supra,* Justice Cobb, speaking for that court, said:

"We know of no law which authorizes either the person against whom the writ is prayed, or anyone else, to come into court and object to the issuance of the writ. There is no precedent for an objection of this character. It is a matter to be determined solely by the judge. And, even after the writ is issued, and the respondent has appeared in answer to it, the sufficiency of the petition (to justify the issuance of the writ) cannot be tested by demurrer, though it seems that a motion may be made to quash the writ because of insufficient averments."

We are aware of what this court said in *Thompson v. Oglesby,* 42 Iowa 598. In that case, the application was made by one other than the person confined, and the question arose as to who should be considered the applicant in determining the venue, and it was there determined to be the party in whose interest the application was filed, and not the person making the formal application. The question here considered was not determined. It was assumed that the writ was wrongfully issued if not made by the judge nearest to the person in whose interest the application was made, and it was assumed that the evidence showing the legality of the imprisonment would be at the place where the applicant was restrained, and the court assumed that this provision of the statute as to the venue was made in the interest of the defendant, the party charged with the illegal restraint; for in that opinion it is said: "If the imprisonment is legal, the *defendant* should be allowed to show it with the least possible trouble and expense."

It is also said,—and in this there is a suggestion that the rights of the applicant ought to be considered: "There is no reason why his imprisonment should continue until he can be brought before some remote court or judge, wherever some person may happen to be who desires to present the petition in his behalf." The court further said: "This case has been argued upon the supposition that if Hannah M. Thompson (mother of the person restrained, and the one who made the application) is not the applicant, within the meaning of the statute, the motion for a change of venue should have been granted. In our consideration of the case we shall proceed upon the same supposition." The only question involved in that case, as appears from the statement of the issues, was not the jurisdiction of the judge granting the writ to issue it, but the right of the party against whom it was issued to have the venue or the hearing changed to the county in which the party was illegally restrained. We do not think the question here presented was in that case involved in the issues considered or determined. It will be noted that, at the time this action was commenced, chapter 293 of the Acts of the Thirty-Fifth General Assembly was not in force, and the same rule applied to public officers and to the citizen alike.

The next contention, that the court erred in overruling defendant's motion for a change of venue from Clayton county to Henry county, is involved in what we have said. This motion was made before the defendant had made any return, and was based upon the following affidavit:

3. HABEAS COR-
PUS: venue:
habeas corpus
statutes exclu-
sive: general
statutes not
applicable.

"I, C. F. Applegate, being duly sworn, on oath state that I am now, and for more than eight years last past have been, an actual resident of Henry county, Iowa, and, during said time, have been superintendent of the State Hospital for Female Inebriates at Mt. Pleasant, Iowa, and all my official acts are and have been performed in said Henry county, and

was a resident of the said county at the time of the commencement of this action, and the issuance and service of the writ of habeas corpus herein; and my only restraint of plaintiff has been as superintendent of said hospital; all of which is true as I verily believe.''

This affidavit for the change rests entirely upon the thought that the defendant is a resident of Henry county, and is superintendent of the State Hospital for Females at Mt. Pleasant, in said county; that he was a resident of the county at the time the writ was sued out; and that the only restraint of the plaintiff by him was as superintendent of the hospital; and proceeds upon the theory that he is entitled to have the venue changed to the county of his residence. Now it is apparent that, if the court had jurisdiction of the subject-matter and of the parties, and had a right to issue the writ and the right to hear and determine the question involved, the fact that it would be more convenient for the defendant to have the hearing in the county of his residence would not be sufficient ground for changing the venue. There is no showing in the application for a change of venue that it would be more convenient for the applicant to have the hearing in Henry county, but it proceeds upon the theory that the statute requires the venue to be laid at a place nearest, in point of distance, to the place of confinement, and this the statute does not require. The judge to whom the application is made is invested with some discretion. Of course, it is a legal discretion, but the question as to whether he will assume jurisdiction or not, if he be the more remote judge, must be determined by him upon the application submitted and the nature and character of the investigation sought. It is not to be assumed that he will abuse his discretion in this respect and assume jurisdiction to the detriment of the public or to the embarrassment of the fair administration of the criminal laws or of the officers charged with their enforcement. The mere fact that the defendant is a nonresident of the

county in which the judge resides, or in which the judge is at the time the writ is issued, the mere fact that there are judges nearer to the point where the plaintiff is restrained (and there is no showing of this fact in the affidavit for a change of venue) than the one issuing the writ, are not in themselves grounds for a change of venue.

The defendant relies on Sec. 3504 of the Code of 1897 as giving him the right to the change in venue for which he applied. This statute provides:

"If an action is brought in a *wrong* county, it may there be prosecuted to a termination, unless the defendant, before answer, demands a change of place of trial to the proper county, in which case the court shall order the same at the cost of the plaintiff, and may award the defendant a reasonable compensation for his trouble and expense in attending at the wrong county."

The defendant also relies upon Sec. 3494, Code Sup., 1907, second division, regulating the place of bringing actions, in which it is provided that actions for the following causes must be brought in the county where the cause or some part thereof arose: "Those against a public officer or person specially appointed to execute his duties, for an act done by him in virtue or under color of his office." A casual reading of the statute authorizing the issuance of the writ will show that these limitations do not apply. There is no question, under this statute, that the plaintiff had a right to apply to Judge Springer, of Clayton county, for the writ. There is no question that he had a right to refuse the writ (though not obliged to do so), if it was made to appear to him that there was another judge more convenient in point of distance to the applicant. There was invested in him, by the statute, a judicial discretion in the matter. An error of judgment on his part as to the existence of conditions which ought to suggest to him the propriety of refusing, even though such conditions were in the statute, would not oust him of

jurisdiction, or a right to hear and determine the question. The legislature, in saying that he had a right to refuse the writ,—in saying that he *may* refuse the writ, not that he must refuse the writ,—evidently were not afraid that the judges of the district would abuse the discretion invested in them, to the prejudice of the public good, and we think we ought not to assume to entertain any such fear. The remoter judge, having jurisdiction of habeas corpus proceedings, and a right to entertain inquisitions of that character, may exercise that jurisdiction upon any showing which satisfies him that the interests of justice would be thereby more nearly attained. There is no limitation on the right of any judge of the district court of Iowa to issue a writ of habeas corpus on proper application, running into any part of the state. Indeed, that right is given him by the statute, and upon a proper showing for a writ, a wrongful or unlawful refusal to grant the writ subjects him to a penalty. But the legislature says that he must refuse the writ, even though properly applied for, if, from the showing of the petitioner, it is apparent that the petitioner would not be entitled to any relief, or he *may* refuse it, unless a sufficient reason be stated in the petition for not making the application to a more convenient judge or court.

We think the motion for a change of venue was properly overruled.

4. HABEAS CORPUS: "Inebriate" Act: commitment "until cured": power of court to determine question of cure: parole.

Division II. Upon this appeal the defendant states his last ground for reversal in the following language:

"The court erred in assuming the power to determine the question of fact, as to whether or not the plaintiff is cured, when the matter was wholly for the determination of the superintendent of the inebriate department of the State Hospital."

This question was not involved in the motion to quash the writ, but appears only in the answer or return made by the defendant, and was made in the following language:

"The defendant further alleges that the plaintiff is not cured, and has never been found to be cured, either by the defendant, or by the board of control."

Whether this allegation in the answer was made for the purpose of tendering an issue of fact with the plaintiff as to whether she was cured or not, or whether it was intended to raise the legal question that the court had no jurisdiction to inquire into the fact whether she was cured or not, does not appear.

Whether she was cured or not was a question of fact. Whether the court had a right to inquire into the fact is a question of law. The question of fact was determined adversely to the appellant in the court below. The case is not triable *de novo* here. If the court had a right to consider and determine this question, its finding is binding upon the defendant. There was evidence to support the finding of the court, and we treat it the same as the verdict of a jury.

5. APPEAL AND ERROR: habeas corpus: appeal not heard *de novo.*

In discussing this question as to the right of the court to hear and determine the question, the plaintiff relies upon Sec. 2310-a12 of the Supplement to the Code of 1907, as follows:

"The board of control of state institutions may discharge any person committed to a state hospital under the provisions of this act on the recommendation of the superintendent when satisfied that such person will not receive substantial benefit from further hospital treatment."

This has no application to the case at bar.

The plaintiff also relies on Sec. 2310-a3, which provides:

"If after thirty days of such treatment and detention a patient shall appear to be cured, and if the physician in charge and the superintendent of said institution shall so recommend, the governor shall parole said patient, provided

that said patient shall pledge himself'' as provided in said section.

There is no provision in this chapter for the release of one confined in a state hospital for inebriates by habeas corpus proceedings. Nor is it necessary that the statute should confer such right. It is a right guaranteed by the Constitution, and a right that cannot be suspended or refused by legislation. See Sec. 13, article 1, in Bill of Rights, Iowa Constitution. In cases where parties are confined in insane asylums in this state, there is a special provision of the statute as follows:

6. HABEAS COR- PUS : right to writ irrespect- ive of statute: "Inebriate" Act.

''All persons confined as insane shall be entitled to the benefit of the writ of *habeas corpus,* and the question of insanity shall be decided at the hearing. If the judge shall decide that the person is insane, such decision shall be no bar to the issuing of the writ a second time, whenever it shall be alleged that such person has been restored to reason.'' (Sec. 2306, Code, 1897.)

It will be noticed that the plaintiff herein was not ordered confined for any definite time. The order provided that she be confined in the hospital until cured, not exceeding three years. Whenever she was cured, she was entitled to be released. Any restraint after she was cured would be a violation of her constitutional right to liberty. These statutes relied upon do not provide any tribunal for determining whether a patient, confined in this hospital, is cured or not. Subdivision a3 of Sec. 2310 only provides for a parole by the governor in the event she shall appear to be cured, and the superintendent and physician recommend her parole. There is no provision for any hearing upon the question of an absolute cure, or her right to be absolutely discharged, upon a showing that she is cured, and there is apparent to us no more reason why a person confined in an insane asylum

as insane should have a right to be heard in a proceeding of this kind, as to whether she is cured or not of her insanity, than there is for a hearing of the same character and kind where one is confined as an inebriate. As soon as cured, the purpose of confinement was accomplished. No longer was there any right, under the order or under the statute to confine her. When the right to confine expired, the right to her liberty arose. When this was refused, her right to the writ to determine her right to liberty was the only avenue of escape.

Sec. 7, chapter 80, of the Acts of the Thirtieth General Assembly provides: "The term of detention and treatment shall be until the patient is cured, and not exceeding three years." The provisions of this act are incorporated in the Supplement of the Code of 1907 as Sec. 2310-a12. The three-year limitation is a limitation upon the right to hold the patient whether cured or not. At the expiration of three years, whether the patient be cured of his malady or not, the right to hold him longer, under the order of commitment, expires. This statute gives a right, under proper order, to hold the patient until cured, but whether cured or not, not to exceed three years. The only provision of the statute authorizing the holding of an inebriate for a full three years is found in chapter 184 of the laws of the Thirty-Fifth General Assembly, which provides for the creation of a department to be known as the custodial department, and Sec. 2 of this act (Sec. 2310-a34, Code Sup. 1913) provides:

"Said department shall be for the confinement of all male persons hereinafter committed to said hospital who have been discharged under the provisions of Sec. 2310-a12, Supplement of the Code, 1907, all male persons committed to said hospital who are found by the court making the order of commitment to be habitual inebriates or drug habituates; and any person committed to the hospital who, in the judgment of the board of control of state institutions acting upon

the recommendation of the superintendent, is believed to be a menace to the maintenance of the discipline of the hospital, and providing that patients of any department of the hospital who leave the institution or grounds thereof without due authority shall be subject to transfer to said custodial department upon the order of the superintendent of the hospital.''

Section 3 (Sec. 2310-a35, Code Sup. 1913) provides:

''No person confined in the custodial department shall be released therefrom until he shall have remained a full term of three years.''

There is no claim in this case that the plaintiff herein should be held under any of the provisions of chapter 184 of the laws of the Thirty-Fifth General Assembly. Nor is the right to hold her based upon any of the provisions of this chapter.

Upon a full consideration of this record, we are inclined to the opinion that the court did not err in discharging the plaintiff, and the cause, therefore, should be and is *Affirmed.*

WEAVER and EVANS, JJ., concur. SALINGER, J., specially concurs. LADD, J., concurs in the conclusions reached in the first division of the opinion; dissents as to the second division. DEEMER, C. J., and PRESTON, J., dissent.

SALINGER, J. (concurring). The importance of the questions decided, and a dissent which has been a progressive development by means of addition and subtraction, and as to which the members of the court have constantly changed in attitude, constrain me to state fully the ultimate conclusions which impel me to agree to the decision of the court, and also the reasoning upon which these conclusions are reached. My ultimate conclusions are:

1. When the officers of a state asylum detain a patient, the tribunals of the county in which the asylum is situated

are, of necessity, the ones nearest the detained patient. If the general provisions on venue that require all actions to be brought in the county wherein some defendant resides, or in which he does an official act, apply to an application in habeas corpus made by such patient, these statutes accomplish that all such applications must be made to the tribunal literally the nearest to the applicant. If that be the true construction of these general statutes, then Code Sec. 4420, which provides that application of habeas corpus "must be made to the tribunal most convenient to applicant in point of distance," has no effect whatever. On that construction, the words of this statute compel application to the tribunal "physically the nearest," a requirement already made by said general statutes. Therefore, I hold that Sec. 4420 is special and controls the general, and that a fair construction of all the statutes on the subject is that while, ordinarily, application must be made in the tribunal nearest to applicant, in habeas corpus, subject to proper guards against abuse, the application must be entertained in a tribunal which, though not physically the nearest, is found to be the most convenient in point of distance.

2. There is no evidence in this record that the tribunal selected by this applicant is not most convenient to her in point of distance; and, in any event, the respondent may not complain on appeal that the applicant was tried in a tribunal not most convenient to her.

3. On the authority of *Ware v. Sanders,* 146 Iowa, at 242, the point of improper forum was waived by producing the applicant.

4. Certain statutes provide for conditional release on parole, upon compliance with stated conditions. I am of opinion that, although one of these conditions is that a parole is obtainable only on the recommendation of the superintendent, this does not affect the jurisdiction of the courts to grant applications for discharge which invoke a statute other than the parole statutes, to wit, the one which provides that

"the term of the detention and treatment shall be until the patient is cured, and not exceeding three years." A parole is a conditional and experimental release before expiration of sentence. But the statute last referred to terminates the sentence whenever a cure occurs, though that be earlier than the maximum time. It follows that one who invokes this statute is not seeking a conditional release before termination of sentence, but is asserting that he is illegally detained because detained after his sentence has expired. Therefore, the parole statutes are not involved; for, though the courts have no power to grant a parole, and its granting depends upon the recommendation of the superintendent, they do have power to discharge one who is being imprisoned after the expiration of his sentence. If, as the minority claims, habeas corpus will not lie to liberate a detained inebriate, then the amendment to the habeas corpus statute which makes the requirements of the statute amended mandatory in applications "by an inmate of or one confined in a state institution" commits the absurdity of making mandatory regulations concerning an application which cannot be entertained at all.

## DIVISION I.

I. The respondent superintendent detained applicant in Henry county by official act done therein. This writ was issued by the district court of Clayton county. If our general statutes on venue control, the minority is rightly of opinion that, initially, none other than the district court for Henry county had jurisdiction to entertain the application. A statute provision on venue requires that personal actions shall be brought in some county in which some defendant actually resides; and the further provision that this rules, "except as otherwise provided," confesses that the main enactment is not exclusive. (Sec. 3501, Code.) Another commands that actions which complain of an act done under color of public office must be brought in the county where that act or some part thereof was done. (Sec. 3494,

Code Sup. 1907.) When the superintendent of a state hospital detains a patient therein, the detention occurs in the county where the superintendent resides, and constitutes an official act done therein. Using the word "distance" literally, the tribunals that sit in that county are the least distant from a patient who seeks release by habeas corpus. If these two statutes provide that the county wherein the superintendent resides and detains the applicant is the only place wherein the application can be initiated, and physical nearness to the tribunal applied to is equivalent to "most convenient in point of distance to the applicant"—if, therefore, it be sound construction that habeas corpus must be applied for in the county where the superintendent resides and detains the applicant, and that this county is the most convenient to applicant in point of distance—it was a waste of words to enact Sec. 4420, which provides that the application "must be made to the court or judge most convenient in point of distance to the applicant." For, on such construction, Secs. 3494 and 3501 accomplish all that the words of 4420 can. If, literally, distance is the test, then the nearest tribunal is the proper one, whether it is or is not convenient. The only way in which the words of Sec. 4420 can have effect is to hold that nearest in distance may not be the most convenient in point of distance. Otherwise, "most convenient in point of distance" means, merely, in the county wherein the superintendent lives—a needless statute, because, without it, that is the only county in which application can be made. Again, the statute provision (Sec. 4419, Code) that the writ of habeas corpus "may be served in any part of the state" is useless, because there never can be occasion to make such service. No one can be detained unless someone is present to detain him. If the writ can be applied for only in a district wherein the detained person is, no writ need ever be issued to operate outside of that district. Construction which results in needlessly disregarding statutes *in pari materia* is not favored, of course, and it is such construction

that the minority declares for. It is clear that all the statutes on the subject may have effect, and that we should not be asked to repeal Secs. 4419 and 4420. Rightly construed, all together provide that, ordinarily, personal actions must be brought in the county where the defendant resides, or in which an official act complained of has been done; recognize that ordinarily the tribunals in such county are the most convenient to which the plaintiff is entitled, that in some instances these tribunals, even if literally the least distant, are not the most convenient to applicant in point of distance, and, therefore, provide, with proper guard against abuse of the practice, that courts may entertain habeas corpus, though other courts are nearer in literal distance, though the respondent does not live in the county wherein application is made, and though applicant be not detained therein. This I construe to be the holding of the majority, and agree to.

It is conceded that *Ware's Case,* 146 Iowa 233, *says* that which supports this position, but it is insisted that its "real decision" is merely that the jurisdiction of the Supreme Court is state-wide. The case expressly holds two things: (1) That as to the Supreme Court or a judge thereof, the statute requiring the application to be made to the tribunal most convenient to the applicant has no application, since the original jurisdiction of the Supreme Court is state-wide. (2) That, at all events, this statute does not expressly provide that the most convenient tribunal has exclusive jurisdiction, nor command the more remote judge to refuse the writ, because the statute is in this respect simply directory, and that, therefore, the writ may be granted by a tribunal not the one nearest to the petitioner.

In *Hamill v. Schlitz Brewing Co.,* 165 Iowa 266, we pass on the effect of a decision by us of a controversy in which it was contended: (1) There is no power, after the jury has returned a verdict and been discharged, to give the defeated party a judgment effecting in result what would be equivalent to directing verdict in his favor; and (2) under the

record, a directed verdict was in no event justified in the state of the evidence, even if it had been applied for before the power to grant it had lapsed. Both contentions were sustained in the decision which Hamill's case, *supra*, reviews. We hold that what was said on both heads is binding law, and not dictum. In other words, though it was unnecessary to go farther, after having held that there was no power to direct a verdict, adding that the evidence did not warrant such direction was a binding decision, and not a "mere dictum or gratuitous or irrelevant expression." Both on this authority and in reason, the "real decision" in the *Ware Case* was more than a decision that the Supreme Court has state-wide jurisdiction. It decides that habeas corpus can be entertained, though applied for in a tribunal not nearest to applicant.

The following is hornbook law: The test is whether a fact has been fully and fairly investigated and tried, and actually determined, or whether it is inferable from the judgment itself that it was determined. 2 Black, Judgments, Sec. 614, approved in *Reynolds v. Lyon County,* 121 Iowa 733, 742, 743. Every point which has been either expressly or by necessary implication in issue, or which must necessarily have been decided in order to support the judgment or decree, is concluded. Freeman, Judgments, Sec. 257. An estoppel beyond what appears on the face of a judgment applies to every allegation which, having been made on the one side and denied on the other, was at issue and determined in the course of the proceedings. *Stevens v. Hughes,* 31 Pa. St. 381.

In the *Ware Case,* the express challenge was not that the Supreme Court lacked state-wide jurisdiction, but that it was not the tribunal most convenient in point of distance to the applicant. That this court is not contemplated by the statute which requires the tribunal to be the one most convenient to the applicant in point of distance, because the jurisdiction of the court is state-wide, is one good answer to this challenge. It is manifestly just as good an answer that,

even if the court did not have state-wide jurisdiction, its jurisdiction was not well challenged because the statute which permits application to be made to the most convenient tribunal is, at most, directory. Not only is the latter a decision because it is an express declaration upon an express challenge interposed, but it can and must be inferred from the judgment that such ruling was made, and of necessity. The challenge was that the court lacked jurisdiction. Both by retaining the application, and in express terms, this contention is overruled. This ruling is the ultimate decision. For such ruling two reasons, equally cogent and relevant, are assigned: first, that the statute in question has no application; second, that if it has, it is merely directory. Both are reasons for an ultimate decision rather than the decision itself. Why the stating of one of these reasons is more the real decision than the other is difficult to apprehend. If the claim asserted by the minority be followed to its bitter end, then the only ultimate decision ever pronounced by a court of last resort is that there shall ensue either affirmance or reversal. If that be so, if the reasons, and all or either of them, for affirming and reversing must be treated as dictum, if the only effect of our decisions is their final result, if there is no function for the announced reasons that underlie and induce the judgments of courts of last resort, and if the reasons assigned for the decision, though relevant and cogent, are mere words, there is no occasion to publish official reports of such decisions.

2.

The hyper-analysis used to minimize the *Ware Case* is in sharp contrast with the plenary effect arbitrarily given to cases relied on by the minority. Whether the one restrained must present the application to a judge in the district of the restraint, or, that being impossible, to the nearest judge who will act, was neither involved nor even discussed in *Thompson v. Oglesby*, 42 Iowa 598. The sole question was whether one

who presented the application of the person restrained was in such sense the applicant as that venue lay with the tribunal most convenient to this presenter. The case was determined in this court upon the concession that, if the presenter "is not the applicant within the meaning of the statute, the motion for change of venue should have been granted." Upon this concession, the only question that could be decided was whether such presenter is such applicant; and all that is decided is that he is not. Some language to the effect that when it may be presumed that respondent and the person restrained are together, and so, that the evidence as to the legality of the restraint would ordinarily be in the same place, then, for the benefit of the one restrained, it should be allowable to show the illegal restraint with the least trouble and expense, is pure dictum, and inapplicable besides. The real decision is further made clear by what follows this dictum, to wit: That "there is no reason why his imprisonment should continue until he can be brought before some remote court or judge, wherever *some person may happen to be who desires to present a petition in his behalf.*"

In *Rivers v. Mitchell*, 57 Iowa 193, 195, the wife lived in Oskaloosa, the husband in Des Moines. The application was made to a judge in Polk county and the point was made that there was no jurisdiction to issue the writ because the application was not made to the court or judge most convenient in point of distance to the applicant. It is held that the children were, in a sense, the applicant, and it would be presumed that they and the father were together, and upon this point the *Thompson Case, supra,* is cited.

On suggestion that to do so is important, I have carefully considered the case of *Laird Bros. v. Dickerson*, 40 Iowa 665. It decides that if, on an attachment against a nonresident, no property is found in the county wherein suit is brought and the venue is changed to a county wherein a levy is made, the levy is valid from its date, and it is said that, except as the manner of its jurisdiction is prescribed by

statute, both by the Constitution and statute the district court "has jurisdiction over every cause *brought* within its district," and that "this idea of the general and unlimited jurisdiction of the district court is further illustrated by the fact that they are styled the district court for the state, . . . with authority to grant writs running into any part of the state. . . . It is therefore clear, . . . that the district courts have general jurisdiction of all matters brought before them." This is not a decision that the court might not err as to venue, but it does hold that there is jurisdiction of a case brought in the wrong county, that there is power to issue some writs running to any county in the state, and is a strong implication that when the writ may thus run, it may have important bearing on whether venue has been rightly laid. While not an exact authority for the ruling opinion, it is none for the dissent, and tends to militate against rather than to sustain it.

*In re Jewett*, (Kan.) 77 Pac. 567, holds that, where a Constitution gives district courts such "jurisdiction as may be provided by law," the exercise of such jurisdiction is limited to "within their respective districts," and where there is no provision to serve writ or process in any county of the state except in *criminal* cases, there is no jurisdiction to order the writ of habeas corpus to run outside the district. This is merely a decision that habeas corpus cases are not criminal cases, and the case *says* that the only question is "whether a proceeding in habeas corpus is in its nature civil or criminal." In treating this as applicable, our statute, which allows the writ to be served in any county of the state, is overlooked.

*In re Doll*, 50 N. W. (Minn.) 607, is this: Under a statute provision that the person applying for the writ must apply to a court or judge in the county where he is restrained, if there be one therein willing and capable to act; that if there are none in that county, application must be made to the nearest or most accessible court or judge capable and

willing to act; that if the application be made to one not in the county of the restraint, proof is required that there be none in that county willing and able to act, and that the more remote tribunal applied to shall deny the application unless such proof is made, it is held that without such proof it is error to entertain the application outside of the county of the restraint. This rule is in a general way followed in *Ex parte Ellis,* 11 Cal. 222, 225, and the statute there is merely that writ may be granted by certain named judges. Neither Kansas, Minnesota, nor California have statutes which authorize habeas corpus to be brought where it is most convenient in distance to the applicant, or permitting the writ to run into any part of the state.

*College of Physicians v. Guilbert,* 100 Iowa 213, was a proceeding to compel the state board of medical examiners to recognize a medical school as being in good standing. Writ of certiorari was resorted to to compel this action, and obtained in a county in which the act complained of was not done, and in which the officers charged with doing same did not reside. The case, therefore, decided rightly that the writ was not warranted. It is not applicable here, because there is no statute provision that the writ of certiorari may be obtained of a tribunal most convenient to applicant in point of distance; because there is no statute like Sec. 4419, under which writ of certiorari may, like habeas corpus, be served in any part of the state; and because the only statute provision as to certiorari is Sec. 4155, Code, that this writ "may be granted by the district court or judge thereof."

*Ex parte Clarke,* 100 U. S. 399, and *Ex parte Virginia, idem,* 339, but hold that when the writ of habeas corpus is directed to an inferior court by the Supreme Court of the United States, it involves appellate review, and that appellate courts are authorized to issue it by exercise of either original or appellate jurisdiction.

*State ex rel. Durner v. Huegin,* 85 N. W. (Wis.) 1046, as to which the minority say that it "is also quite closely in

point," holds that, for the purpose of review as to who are adversative parties,—or plaintiff and defendant, no matter how named,—as to what counsel may be paid by the state, and in settling what is *res judicata,* a habeas corpus proceeding is civil and not criminal.

Sec. 260, Code, cited, deals with the superior court, and provides that "said court shall have jurisdiction concurrent with the district court in all civil matters," except some excluded in terms.

*Barranger v. Baum,* 30 S. E. (Ga.) 524, says nothing about habeas corpus, except that it is an extraordinary remedy within the purview of statutes which prescribe the time for filing bill of exceptions in suits which seek an extraordinary remedy; and that where an extradition warrant is asked, petitioner may show on habeas corpus that he has given bond in bail trover for goods involved in the criminal charge upon which the warrant is demanded.

Surely none of these make clear that the voice of authority is against entertaining habeas corpus as was done below.

II. The dissent presents the following arguments (stated in ultimate effect) why the statute should be construed to limit entertaining the application to the tribunal nearest to applicant. Roughly, these arguments are: · (1) Opportunity for harassment of respondent by captiously selecting a tribunal at great distance, which, as is claimed, the judge has no power to deal with because he cannot refuse the writ. (2) Hardship or expense, or both, to respondent and witnesses. (3) There is no adequate review, if any. (4) It has been the custom of the Supreme Court to send such application to the tribunal nearest to applicant.

As to the last, the general statutes on venue contemplate that, unless special provision be made, all actions, and, consequently, all complaints of official action, must be prosecuted in the tribunal nearest to the impleaded official. Therefore, if a special provision is made that a particular complaint shall be presented where it "is most convenient in point of

distance to applicant," these words are not repealed because the Supreme Court has sent applications which comply with these words to a district court nearest to applicant. And, for all that appears, the particular courts to which such transfers have been made were not only nearest to applicant, but, as well, "most convenient in distance." If sending such an application away proves that the statute under consideration has no effect, it can be as well argued that the transfer repeals the law which authorizes the Supreme Court to entertain habeas corpus.

### 2.

As to the claim that, in details specified, such great hardships will follow our construction as that it should be held that the legislature meant nothing by the words it put into Sec. 4420, I am of opinion that most of these hardships are fancied; that as much hardship will result from adopting the construction favored by the minority; that if any burdens are created by the view of the majority, the legislature must have foreseen them; and that clear words in a statute should not be cancelled because their natural effect is to produce consequences anticipated by the body that employed such words. I think what has just been said is applicable to most of the arguments advanced by the minority, which have not as yet been referred to. These are:

a. As to the statement that the patient will be encouraged to bring as many applications as he can induce attorneys to institute, and he or his friends may be able to finance, and this as a method of obtaining a release without the burdens attached to release or parole—As will be shown later, an application to be discharged because cured is not one for, and if granted does not obtain, a parole. Hence, the construction of the majority will not enable one to use an application like the one at bar as a means of getting a parole. A patient may vex officers by repeated applications, whether venue lies in

one county or another. However, the average inmate of an asylum is hardly in position to finance any such applications.

b. The argument that allowing application to a tribunal literally not the nearest might "perhaps" be a burdensome expense to the state, and, certainly, upon respondents who are not rich, is met in part by the minority which makes such argument with the statement that "attendance in the supposed case is compulsory." And, as will be later pointed out, witnesses might have to go a greater distance to attend upon a court in the county where the superintendent lives than if the inquiry were held in some other county.

c. It is claimed that under our construction actions may be brought in remote counties though "there be no shadow of excuse" for proceeding there; that, if the plain words of the statute be given effect, it will be possible "for some worthless vagabond of a father" to call the mother to defend her rightful custody of their child in the most remote of counties, by his merely alleging that he and his witnesses live there, and that it is most convenient for him as a place of trial; that the court or judge has no discretion and must entertain such application, and is subject to a penalty if he refuse; that, therefore, no review of the right to apply exists below, and that there is no adequate appellate review. I answer that, if the construction of the minority ruled, these applications would have to be made in the county of respondent's residence; that, therefore, there could be no review anywhere else, no matter how much hardship the making application in that one county would create; that, as will presently appear, trial in that county might be much more burdensome than if held in some other county; and that for the rest, the premise is faulty, and the deduction irrelevant. There is no law which penalizes the judge who rightly denies the writ of habeas corpus and the minority itself suggests that there may be a transfer of the application or a quashing of the writ issued—which, of course, presupposes review. As will be seen presently, review below is not only permitted but imposed. So far as review

on appeal is concerned, that is, under well-settled rules, far from plenary. But it is as full as appellate review of the kindred acts of denying or granting a change of venue, and, surely, if review of an act authorized by statute is inadequate, additional legislation, rather than judicial amendment or repeal, is the remedy. The minority errs in the premise that the courts have no power of review, and in the deduction that they will not refuse to entertain applications wrongfully made in a more remote county,—that they will hold a tribunal to be most convenient in point of distance to applicant when that is not true. All this simply overlooks the statute contemplating a judicial inquiry into whether the tribunal selected is the one authorized by statute, in that it provides that if the one selected be not the one most convenient in point of distance, the application shall not be entertained unless a satisfactory showing be made which excuses the selecting of the less convenient court or judge. It also ignores the foundation upon which the administration of justice must rest, to wit, the presumption that the judges of the land will not entertain applications where the selection of the tribunal is not warranted by statute, is purely captious, made with evil intent, and is without "shadow of excuse."

d. The statement, that "whether she was cured or not was not within the knowledge of persons living within Clayton county; for it is conclusively adjudged (in that county) that where they knew her she was addicted to the drug habit and should be confined in an asylum" either means nothing whatsoever or else asserts that, if one is an inhabitant of a county wherein a patient is adjudged fit for detention, he can never have knowledge that the person there committed has been cured. This ignores that whatever was adjudicated in Clayton county binds equally the inhabitants of all the counties. And it makes the impossible claim that the inhabitants of a county wherein a patient is adjudged to go to an asylum can get no knowledge that the person committed has later been cured. In the same case is the statement that "no one but witnesses

who saw her after she had been taken to Mr. Pleasant could give any opinion as to her recovery; so that not only the parties but the witnesses were at Mt. Pleasant.'' If one concede that none but witnesses who saw applicant after she had been taken to Mt. Pleasant could give an opinion as to her recovery, I know of no law which prohibits people who live in Clayton county from seeing her while in Mt. Pleasant.

e. A thought already expressed may properly be amplified in this connection. Since general statutes provide that all applications must be brought in the county wherein the respondent lives, the legislature must have foreseen that the special provision, that a particular application should be brought in the county most convenient in point of distance to the applicant, would probably be understood to provide for cases in which courts might entertain the application on the ground that it was most convenient to applicant in point of distance, although not the nearest in distance. It must have been known that the arrangement of railroad service and the location of witnesses might make the tribunal nearest in an air line more inconvenient than one not so near in distance physically. In foreseeing this, is included anticipating that applications might be made before tribunals not most convenient in point of distance,—that there is opportunity to institute vexatious litigation and impose burdensome expense, and other hardships. When, therefore, in the knowledge that either or all of these might happen, the legislature made this specific statute covering particular cases, and additional to general statutes, construction should not make this special provision idle, nor deal with the general statute as though no addition thereto existed, merely because there might result under this special statute what the legislature must have foreseen would, or might, follow its enactment.

f. If the tribunal applied to is ''most convenient in point of distance to the applicant,'' it is not material, were it true, that trying the application before such tribunal is, in some regards, greatly more burdensome than would be trial before

some other. If obeying the statute creates avoidable and undue hardship, the remedy must come from the legislature. The judiciary is limited to inquiry whether the tribunal selected *is* most convenient to applicant in point of distance. The vital question for the court is what provision the legislature has made, not whether it might have made a better one. But it is not true that no hardships will follow on the construction favored by the minority. Most convenient to applicant involves (1) the distance he must travel, (2) the convenience of that travel, in the sense that a court more miles away may be more readily accessible than one not so many miles away, and (3)—as is strongly intimated in *Thompson's Case, supra*— where applicant's friends and witnesses are. We take judicial notice that courts and judges act in county seats, and that it may be much more difficult to reach the seat of the county in which some of the parties live than to reach some other county seat. The friends and witnesses of applicant may be so located as that some county other than the one in which respondent lives may be most convenient in point of distance, i. e., the distance these must travel. If the majority is right in holding that only those who saw the patient in the hospital can testify as to his recovery, hardship would surely result from giving the tribunals of the county wherein the hospital is exclusive jurisdiction in a case where all who had there seen him, except the respondent and his subordinates, always lived in or had removed to a part of the state remote from the hospital.

If we follow the elementary rule affirmed by the *Ware Case*, that, in determining whether procedure in habeas corpus is valid, we should not construe "with overtechnical nicety," and that everything which is "ambiguous or doubtful should be interpreted liberally to promote the effectiveness of the proceeding," it is not difficult to find that the legislature had a substantial reason for this exceptional and clear statute. The very reasons which ordinarily make it a hardship to litigate in courts held in counties in which defendant does not reside are reasons for letting the convenience of the applicant

in habeas corpus determine. the forum. The superintendent or physician is not at home in the asylum in the ordinary sense of home. He defends for the state, and the state is not a stranger in any of its courts. If it is permissible to presume that local sentiment may be hostile to the state, then it should be arranged that all indictments be tried at some spot, as nearly central to all the inhabitants of the state as possible, where the state has no enemies. On the other hand, the hospital town is not the home of the patient. That patient may be a child whose home, friends and evidence are far from the place of detention. In many, if not in most cases, evidence and help to establish the right to liberty may, as seen, be found in some place other than the county in which the institution is. Have we the right to annul the legislative will which so plainly desired to give the patient an opportunity to overcome a handicap—to permit him to make his struggle for freedom where he thought conditions the most favorable?

III. By a statute requiring applications in habeas corpus to be made to the tribunal most convenient to applicant in point of distance, although other statutes provide that actions, generally, must be prosecuted in those that are physically nearest, and by enacting that the tribunal applied to may refuse the writ unless applying to the more remote court is well excused, the legislature recognizes that judicial inquiry may be necessary to determine whether application had been made to the proper court—whether the tribunals of the county in which respondent lived were or were not the ones most convenient to applicant in the sense of the statute. We said in *Ware's Case, supra,* that ''the phrase 'convenient in point of distance' is one of quite indefinite meaning, and often might reasonably be applied to any one of several judges residing in different localities.'' It is clear, then, that whether the tribunal applied to meets the requirements of this special statute is a pure question of fact. By entertaining the application, the trial court resolved this question of fact in favor

of the position that the tribunal selected was most convenient to applicant in point of distance. This being so, there are two reasons, resting on accepted rules of practice, for not disturbing this finding: (1) Such finding of fact, ordinarily, concludes us, and no evidence was put in to support a claim that the court applied to was not the one so most convenient. (2) The respondent may not complain that the court selected by applicant was not the one so most convenient to applicant. While the court may decline the writ if proper excuse is not made for bringing the application in the more remote county, error in retaining the application avails only those who are injured thereby. This statute is for the benefit of applicant, and does not consider the convenience of respondent. He may not complain that applicant went before a court less convenient to him than he might have selected. The respondent is not harmed because his adversary was content with less than the law gave.

IV. As the minority concedes that the amendment of Sec. 4420 by Acts Thirty-fifth General Assembly, Ch. 293, does not affect this appeal, there would seem to be no occasion to refer to this amendment. But it is so misconstrued as that, for the benefit of future litigation, such construction should not go unchallenged. And the view taken of the effect of statute amendment on decisions upon which the amendment does not operate is such as that approval by silence would endorse an utter confusion of the relations between the legislative and judicial departments. The amendment referred to makes two changes: (1) compels the refusal of the writ if application be not made to the tribunal most convenient to applicant in point of distance. Before, such refusal was discretionary. (2) On the question whether a case exists for retaining the application, though the tribunal is not thus most convenient, no consideration is to be given to the convenience or preference of attorneys, witnesses, or other persons interested in the release of applicant. An amendment that an application must be denied unless good reason be shown for

entertaining it in a tribunal not most convenient to applicant in point of distance, and defining what is not a sufficient reason for entertaining an application made to a tribunal not thus convenient, manifestly works no change whatever in the statute which, in express terms, puts the venue with the tribunal thus most convenient. The amendment is wholly confined to what shall be done if application is made to a tribunal not so most convenient. The tribunal which *is* thus convenient remains the proper one.

The dissent proceeds on the assumption that said amendment has relieved the people of the state from various alleged oppressions possible under a construction which allows an inmate of a state institution to bring habeas corpus where the statute says he may. It congratulates the legislature upon "this providential act"—providential because of the fancied relief given superintendents of state institutions. Mingled with this felicitation upon what, as seen, the legislature has not yet done, is regret that the imagined relief given to such officers was not extended to all respondents in habeas corpus; and thus the dissent justifies itself with the statement that none would have been written had the legislature done its whole duty. The minority assumes that this imagined and lauded relief was given to cure in part the evils arising from the views of the majority—views not announced when the legislature acted. Upon this is based the hope that, under the spur of this dissent, the assembly will complete what has not yet been begun.

But just how is this judicial pronouncement justified, or proper, or relevant, if the legislature had acted as the dissent asserts? If the legislature thought it proper or necessary to amend the statute under consideration, that was its right. Such amendment may prove that an amendment was needed to make the law what the minority asserts we should declare it to be without reference to amendment. But the amending of a statute is surely no reason why the Supreme Court should have done the amending, and beaten the General Assembly in

a race at law making. If the legislature has by amendment given certain officers an immunity, it must be assumed that it needed the act of the legislature to create such immunity; the Supreme Court is not to create it. In the last analysis, the dissent is a criticism upon the court for the failure to anticipate by decision what the legislature has finally done by enactment. It is hardly the accepted understanding of the functions of courts of last resort that they are to relieve the legislative department from making such amendment to statute law as it may develop is needed.

V. All questions of whether this application was entertained in the proper forum have, on the authority of the *Ware Case*, 146 Iowa, at 242, been waived by the fact that the respondent appeared to the writ and produced the patient. In that case we said:

"In the last cited case (*Simmons v. Georgia Iron & Coal Co.*, 117 Ga. 305, 43 S. E. 780), where question was raised whether the particular judge issuing the writ should have entertained the proceeding, it was held that, as the party against whom the writ issued appeared and produced the petitioner and pleaded to the petition, objection to the propriety of the judge's action should be overruled. The same principle appears to be affirmed in *Broomhead v. Chisolm*, 47 Ga. 390; Church on Habeas Corpus, Sec. 156; Re Ross, 3 Practice Reports (Can.) 301. In the *Broomhead Case* the court, responding to an objection to the jurisdiction, said that whatever might have been the decision had the respondent declined to produce the prisoner, it was unnecessary to consider, for, 'having brought him before the judge in obedience to the writ, we are not disposed to scan too critically the mode in which he got there, but hold that being there, the judge had authority to pass such order as the nature of the case demanded.' "

### Division II.

As the result of a laborious analysis of numerous statutes, the minority finds that female inebriates are received

at either of the hospitals for the insane, while male inebriates are received in the institution at Knoxville alone; that the statute which allows release before expiration of term applies to the institution of Knoxville only, and declares upon these findings that it was a mistake to commit the applicant for a term which could be shortened or suspended, and that the sentence erroneously imposed on her should be treated as a definite sentence for not less than one nor more than three years, a sentence authorized by a statute under which she was not committed. If what the minority says is to have any effect, it is its ultimate conclusion: (1) That the legislature intended to make it possible for a woman to be detained after she was cured, while the term imposed upon the male could at least be suspended by parole upon the mere belief that he appeared to be cured. (2) That while, where a statute is not applicable to women, they may not use its provision to gain freedom, such statute is, however, effective to put them into and keep them in detention.

It is the fact, and at one stage of its evolution the dissent admitted, that no question is made as to the propriety of the commitment. Under it the superintendent took and keeps applicant. Surely, one who is imprisoned may invoke the law under which the detention is justified, in testing the legality of his detention. See *Jones v. McClaughry*, 169 Iowa 281. If this be not permitted, and if the sentence is not warranted by the statute under which it is ordered and is being executed, then the writ must be sustained without consideration of who can discharge a patient rightly committed; because, of course, habeas corpus lies to liberate one who is detained under a law which does not apply to him—upon a commitment which has no law to rest upon. But because a distinction as to who may be paroled is utterly arbitrary if based upon difference in sex, I am firmly persuaded that the legislature did not intend to make such distinction. One cannot conceive why a woman, and not a man, should be detained for a fixed term, without provision for liberation if sooner cured. To construe the law

thus is to disregard the elementary rule declared in *Ware's Case, supra,* that in dealing with habeas corpus, or other remedies in aid of liberty, the construction should not exhibit "overtechnical nicety," but should be one that is "liberal and calculated to promote the effectiveness of the proceeding."

II. The statute under which the application at bar is made provides that "the term of detention and treatment shall be until cured, not exceeding three years"; other statutes, that there may be conditional release upon the recommendation of certain hospital officers, and before it has been determined there has been a cure, if (1) there is apparent cure, or (2) if these officers believe there has been a cure. The dissent points out, rightly, that habeas corpus will not lie unless the applicant be entitled to unconditional and absolute release, a release without any of the safeguards thrown about the granting of parole. It is urged there should be no unconditional release because it can never be known except by long continued conduct that there has been a cure; that no release by the court is in any view warranted unless the conditions are exacted for which the parole statute provides; that if, on application for absolute discharge, the court would find no more than an apparent cure, a complication would arise on whether, upon such finding, the hospital officers must give a parole. The question is asked whether it is possible there can be full release in one case and conditional in another. It is said the difference between actual cure, apparent cure, and cases wherein the superintendent believes there is a cure is too refined for distinction, and argued that, if the court had any jurisdiction to release, all applications for release are for the court, and that this destroys the conditional release provided upon recommendation by the hospital officers. The ultimate argument made, in terms, is that the contrary is true; that there can be no release by the court, and the hospital officers alone can act either upon apparent or actual cure.

I shall attempt to show presently that all this rests upon the misconception that one who applies for liberation because

detained after cure has ended his sentence is applying for a parole. For present purposes, it suffices to say that, if the courts have *no* power to determine on habeas corpus whether an inebriate is being unlawfully detained at the state hospital, it will have to be explained what the legislature meant by Ch. 293, Thirty-fifth General Assembly, wherein it amended the habeas corpus statute by making the provisions of that statute mandatory in all cases where "the applicant is an inmate of or confined in a state institution." The amendment makes no exception, and surely one committed as an inebriate is "an inmate of or confined in a state institution." If habeas corpus may, under no circumstances, be resorted to by an inebriate thus confined, what occasion was there for a provision that as to him the requirements of the statute on applications for habeas corpus *must* be followed?

### 2.

The statute under which applicant was committed enacts that the "term of detention and treatment shall be until cured, not exceeding three years." Self-evidently, this contemplates that rightful detention is at an end whenever the patient is "cured." The gravamen of the application here is detention after cure. Other statutes provide for releases of patients "whom the superintendent believes to be cured," or so much improved as to make their release on trial advisable; and so if "after thirty days' treatment and detention a patient shall appear to be cured." Notwithstanding the assertion of the dissent that the legislature makes no perceivable distinction between a cure and an apparent cure, and that when the superintendent believes there is an apparent cure this is in his mind equivalent to actual cure, it is perfectly manifest that the legislature has made a clearly expressed distinction between cases of actual cure and those where the superintendent believes a cure exists, or where the patient "shall appear to be cured." The very words used in the statutes

prove that such distinction is made, more clearly than any argument can.

Under the Constitution, and Sec. 225 of the Code, the district court has "general, original and exclusive jurisdiction of all actions, proceedings and remedies, except in cases where concurrent or exclusive jurisdiction is *conferred* upon some other tribunal." Whether, under this, it was necessary to give the district court jurisdiction in habeas corpus needs no consideration because it is elsewhere expressly given such jurisdiction; and the grant is exclusive, except that the Supreme Court, its judges, and those of superior courts are also given such jurisdiction. As habeas corpus can be entertained by the district court, and as it is the proper remedy for one who is illegally imprisoned with or without form of law (*Express Company v. Lynch,* 65 Ga. 240, 245; *Barranger's Case,* 30 S. E. (Ga.). at 527, left col.), it follows that, unless some statute has made an exception, the district court has power to discharge one who is illegally detained in a state institution. And as the officers of such institutions have no inherent power to make judicial investigations, and to release patients as their result, it follows, also, that as to such officers the power to release a patient is exclusively in the district court, unless some statute has given these officers either exclusive or concurrent authority. That certain statutes hereafter discussed give such powers in some cases is true, and it may be assumed that, in so far as power is conferred at all, it is exclusive. But as the court has power to act in the particular case at bar unless same has been exclusively conferred upon officers of state hospitals, the exact question is whether this has been done. Now while the statute says that the term shall end when the patient is cured, it does not say who shall determine whether a cure has occurred before the maximum time of the commitment has expired. Such silence authorizes the district court to make such inquiry and no silence can authorize said ministerial officers to make it. This particular statute, then, gives the court power to act, and no

power to said officers. If the court does not possess this power, it must, as said, be due to the fact that other statute provisions deprive it of that power. In varied ways, the minority insists that the so-called parole statutes divest the court of power on habeas corpus to say that an actual cure has occurred, and that, therefore, detention is unlawful. The remaining question is whether said statutes have any reference to release for actual cure. If these make all releases dependent upon recommendation by the hospital officers, and the exactment of certain conditions, then the trial court erred; otherwise its decision is right. One statute needs little consideration on this inquiry: it provides that the board of control may discharge persons committed on recommendation of the superintendent "when satisfied that such person will not receive substantial benefit from further hospital treatment." (Ch. 119, Thirty-second General Assembly.) Certainly, this does not deal with cases of cure, but contemplates rather those in which cure is found to be hopeless. Other provision is that, upon signing prescribed pledge, making report and other conditions, and with provision for return on breach of pledge, or failure to observe conditions, any patient may be "paroled" if the superintendent believes him to be cured, or so much improved as to make his release on trial advisable. (Ch. 185, Thirty-fifth General Assembly.) The only other provision permits parole by the governor on the recommendation of the physician in charge and superintendent, and on similar conditions and pledges, in cases where the patient shall appear to be cured after thirty days' treatment and detention. Beyond question, these authorize a parole on recommendation of these officers, and the exacting of said conditions in all cases where the superintendent believes a cure exists, or there is so much improvement as to make release on trial advisable, and where the patient "shall appear to be cured." But the power thus given confers only what it gives. It deals with experiments in cases wherein it is merely possible that a cure has occurred, and makes provision for summarily curing the

error if the conditional discharge prove an error. These do not pretend to negative that a patient may be actually cured, and do not intend to cancel the other statute which deals with cure only, and ends the term upon cure. The parole statutes no more give exclusive authority, or any authority, that said officers may determine whether there has been an absolute cure, and, therefore, a warrant for absolute discharge, than giving the board of control the power to issue a parole takes from the governor the power to issue a full pardon.

### 3.

The essential error of the minority is confusing an application for parole with one which asserts that the applicant is being detained after his sentence has expired, and holding thereupon that a statute which contemplates that the sentence has expired when a cure occurs, and fixes a maximum imprisonment of three years, has the same function as statutes which allow an experimental release before sentence has expired. The statute invoked by applicant does not commit for three years, but until cured,—is not a law that cure fails to terminate the sentence short of three years, but that, whether cured or not, the state will carry the burden not more than three years. Were it *conceded* that the patient has in fact been cured after the lapse of but one year, it would follow that the detention had ended, and that subsequent confinement was illegal. The essence of parole and kindred statutes is that they involve an optional clemency. To an act which one may do or refuse to do, the condition may be attached that it will be done only if named persons so recommend. When one of whom relief is sought which is optional attaches conditions the most unreasonable, all the seeker can do is to abandon his quest. But those who seek release under the statute at bar are not asking clemency. They are not asking an optional shortening of sentence. They urge, and I think rightly, that their term ends whenever cured, and that the three years' maximum is an administrative provision to re-

lieve the state if treatment for three years fails to get a cure; that they are cured, and are being unlawfully restrained because detained after their sentence has expired.

### 4.

Unless we may presume that judges will not act honestly and intelligently, the fact that hospital officers will deal with conditional releases honestly, and under the guidance of professional skill, furnishes no argument for taking from judges the power to determine whether there should be an absolute release. It might be a wise law that certain questions should be decided by experts, but the most we have is a rule that in some cases the testimony of experts is entitled to special weight. In no instance has power to act judicially been taken from courts on the ground that ministerial officers can give a wiser decision. If it is all wrong that the mere "belief of the trial judge" that a patient is cured may liberate such patient, it should be made impossible to grant a directed verdict discharging one accused of murder on the ground that the judge believes the evidence fails to show guilt. The statute which contemplates absolute discharge upon proof of cure may be lame in failing to provide for the possibility that such release may prove unjustified, but that is for the legislature. It may be said in passing that the minority rests itself not upon the fact that the judge discharges without providing for recaption, but upon the ground that nothing but the judgment of the hospital officials justifies a discharge, and that neither courts nor judges are given power by statute to review their judgment or belief. In other words, if the ministerial officers released on the conclusion that there was an absolute cure, the failure to provide for recaption would not be considered very material. But, after all, any error in absolute release can be cured by a new commitment, which is more than can be said if one tried for felony be erroneously discharged. Of course, it would be ideal if courts never erred, but absolute freedom from error would not result from allowing all cases

to be decided by experts. If jurisdiction depended upon proof that the courts had expert knowledge, and were infallible, they would rarely have power to act.

The statute which permits judicial inquiry on whether sanity has been restored is at least one instance wherein the legislature thought courts fit to investigate mental condition, and did not feel impelled to leave such inquiry to superintendents and physicians. True, this statute does not refer to inebriates. But the claim that any construction is wrong unless it give the expert exclusive judicial power is weakened by the fact that, in the one instance at least, the legislature, in express terms, left the determination of mental condition to the courts. Can it be that the legislature did not intend to trust anyone but a doctor or superintendent with determining whether an inebriate had been cured, unless so much of an inebriate as to have been committed for being insane?

5.

Statements that certain ministerial officers alone have power to release, provided there be "absence of fraud, or want of good faith," or unless it appears that the failure or refusal to recommend a discharge was fraudulent or corrupt, or unless, in spite of proper conditions, a parole was refused, are less a successful avoidance than a confession of untenable argument. If the legislature has conferred on certain officers the exclusive authority to release, the motives and the propriety of the conduct of the tribunal so clothed with exclusive authority are quite immaterial. In that state of the law, the courts have no power to grant relief, although the only ones authorized to grant it have improperly or unjustifiably denied it. For, when the legislature entrusts a function exclusively to an officer, it creates a conclusive presumption, binding on all other tribunals, that those alone authorized to act will act rightly. Their motives and conduct and omissions can be dealt with only by a change of officials and the change can but substitute others equally beyond control. If the minority

is right, then though the patient be as sound as any mentally, and though the officers testify upon compulsion, by subpoena, that the patient is cured, he may not be released on habeas corpus because these officers have not formulated what they testify to into an official recommendation and a release.

III. The minority urges that unless we construe the statutes as a whole to provide that no patient can be released except upon recommendation by the officers who detain him, these officers would be "involved in constant litigation," and liable to be haled into court at any time to have a judge determine whether the applicant appeared to be cured; that such patients are of sound mind and generally have friends to help them; that these will make it very unpleasant for the officials; that the judges in the districts in which the hospitals are located will "have their hands full in hearing habeas corpus actions"; and, also, that the officials will be greatly harassed by applications made in remote parts of the state, brought without attempt first to obtain a parole; and that the decision upon such applications is beyond review. That there is review has been shown, and that, if same be inadequate, the legislature must enlarge it has already been said, and is manifestly true. If the officials are threatened with harassment and the judges will be burdened because patients are allowed to apply for discharge to a court, certainly that will be true to even greater degree of applications made in the county of the detention. Such burden will be lighter if distributed than if centered. Passing whether patients committed as inebriates are usually prepared to indulge in expensive captious litigation, the "friends" will more readily finance repeated applications that can be made cheaply than those brought at a great distance from where the trial is in truth most convenient. Granting that habeas corpus will lie at all, the argument based upon the possibility of vexatious repetitions of the application is irrelevant. This court and many others are committed to the doctrine that vexatious litigation will not be enjoined, nor damages allowed because

such is instituted, even when the promoter is insolvent. *Gray v. Coan,* 36 Iowa 296. Code Sec. 2306 provides that persons confined for being insane may re-bring habeas corpus after their sanity is denied by decision on an earlier application. While it is true that the statutes dealing with insanity do not refer to inebriates, yet such statute as to habeas corpus sought by one detained as insane is relevant to meet the argument that the legislature never enacts legislation which can make vexatious litigation possible.    At least this one statute expressly permits repeated inquiry into mental condition. Therefore, the bare possibility that, under one construction of another statute, repeated investigation of whether an inebriate is cured is possible does not prove that the legislature did not intend such construction.   If, as I believe, the statutes under consideration are not ambiguous, then it is immaterial that hardships may result from their enforcement.   Of course, such consequences are to be considered if statutes that make them possible are not clear.

IV. As the legislature has not given hospital officers any power to decide whether an absolute release shall be granted because an absolute cure has occurred, the question whether the Constitution permits such power to be given should not, under well-settled and salutary rules, be discussed.   But since the Constitution is invoked for the argument that, as parole laws are constitutional, the giving to ministerial officers power which makes it possible for them to keep a cured patient under detention is also constitutional, I feel impelled to say this:   That one law is valid does not necessarily establish the validity of any other law, unless their effect and general scope are substantially the same.   I have already pointed out that an application for parole and one for unconditional discharge upon allegation of complete cure are essentially different.   I may add that a statute giving ministerial officers exclusive judicial power to detain one after his term is ended, thus prohibiting review of the act by the courts of the land, would deny due process of law on at least two grounds:   (1) Every

definition of "due process" includes action by a tribunal competent to act. These officers can act, if at all, on specific grant only. There is none, specific or otherwise. (2) It seems to me the legislature cannot say that the courts have no power to determine by habeas corpus, or some other sanctioned judicial procedure, whether there is an illegal restraint, and to liberate one found to be so restrained, and that to turn this power over to boards of control, asylum superintendents or asylum physicians also denies due process.

If such power to liberate cannot be taken away, and, at any rate, where it has not been attempted to take it away, the courts have power to inquire whether one confined under the statute at bar has been cured. This is an inquiry which lies in the path of whether there be detention after the term. Therefore, by inherent right, constitutional grant, general statute grants, and the grant of power to sit in habeas corpus, the trial judge committed no error in construing and applying this statute, and in asserting the right to liberate the applicant if it were found she was cured at the time she applied.

DEEMER, C. J. (dissenting).—I. The conclusion reached by the majority is fraught with such vital consequences that I cannot concur therein. Fortunately, the legislature has cured one of the mischiefs of the opinion by the enactment of Ch. 293, Acts of the Thirty-fifth General Assembly, making it impossible hereafter for inmates of inebriate asylums to commence actions of habeas corpus against the superintendents of the hospitals before any judge in any county of the state, no matter how remote, and compel him to go with all his witnesses to such remote court to resist the charge that an inmate has been cured of his habits and should be discharged. But for this providential act of the legislature, the superintendents of these hospitals would, under the majority opinion, have little time for anything else than to defend suits brought for these inmates; and would be subject to costs and other expense for which there seems to be no reimbursement from the state.

Again, a refusal to discharge is not an adjudication save as to the condition on the day of trial, and there is no limit as to the number of actions that may be brought by such persons against the superintendents.

Again, without any request from a patient for a parole, this patient may go to any part of the state, bring his action of habeas corpus, demand a trial and put the expenses upon the superintendent or perhaps upon the state, without any request whatever for a parole or conditional release. The effect of this holding upon the administration of our inebriate asylums is that efforts of the state to cure the liquor or drug habit might as well be abandoned. On the first proposition involved, in view of the recent act of the legislature, I would not dissent but for the fact that other actions, as by a parent to recover possession of his child and other actions of like nature, may, under the holding of the majority, be brought in the most remote county of the state, provided a district judge can be induced to grant the writ; and there is no way in which to reach an erroneous order for a hearing and trial in that remote county, although there is no shadow of excuse in fact for bringing it there. In this way, persons in close financial circumstances, having the rightful possession of a child in Fremont county in the southwestern part of the state, may be compelled, say, by the worthless father of a child, to appear before the district court of Allamakee county in the northeast corner of the state, and must pay the expenses of the trip, and doubtless, on request, advance witness fees. The attendance in the supposed case is compulsory, and, according to the opinion of the majority, there is no power to review the question of the right of the district court to issue the writ. I cannot assent to this conclusion.

Section 4420 of the Code provides as follows:

"Application for the writ must be made to the court or judge most convenient in point of distance to the applicant, and the more remote court or judge, if applied to therefor,

may refuse the same, unless a sufficient reason be stated in the petition for not making the application to the more convenient court or a judge thereof.''

Under previous decisions, the applicant has been held to be the person whose liberty has been restrained, no matter who the plaintiff or relator. In the opinion of the majority, this provision as to who may issue the writ has always been the law. Of course, the Supreme Court, or a judge thereof, has jurisdiction co-extensive with the state. But this is not true as to district or superior courts or judges thereof. Their jurisdiction is limited to their respective districts, and, as a rule, to persons within their district. See Code, Sec. 225, *et seq.*, Sec. 260, *et seq.* In certain instances, cases may go on change of venue to other districts, as authorized by Sec. 249, Code, and judges may interchange and they may be assigned out of their regular districts. But the general rule is as above stated, and it requires a special statute to give them any other jurisdiction. Again, personal actions must be brought, as a rule, in the county where the defendants, or some of them, reside. And it is especially provided that actions against a public officer or person specially appointed to execute his duties, for an act done by him in virtue or under color of his office, or for neglect of official duty, shall be brought in the county where the cause, or some part thereof, arose. Code Sup., 1907, Sec. 3494. Under the latter statute, it was held that a writ of certiorari against the state board of health must be brought in the county where the board acted. *College of Phys. & Surg. v. Guilbert*, 100 Iowa 213.

The statute giving jurisdiction to the district court in certiorari cases is quite as broad as the one giving such courts jurisdiction of habeas corpus matters, in that it says that the writ may be granted by any district court or judge thereof. Compare Secs. 4155 and 4419 of the Code. Again, as a rule, under the law before its amendment, application must be made to the judge nearest in point of distance to the person

whose liberty is restrained; and if for any reason he cannot or
should not act, then to the next nearest in the district where
the applicant resides; and if that one cannot or will not act,
then possibly to the next nearest outside the district.   That is
what is held, as I understand it, in *Thompson v. Oglesby*, 42
Iowa 598.   It makes no difference that the applicant has a
legal residence in some other county; the test is the physical
presence of the person whose liberty it is claimed was unlaw-
fully restrained.   In *Thompson's Case*, the holding was that
the petition should have been presented to the judge of the
district court next nearest the person whose liberty was
restrained, and it was there said:

"Again, the plaintiff and defendant, the person restrained
and the person restraining, must be presumed to be together.
The evidence, if any, showing the legality of the imprisonment
would ordinarily be at the same place.   If the imprisonment
is legal, the defendant should be allowed to show it was with
the least possible trouble and expense.   If the imprisonment is
illegal, the person restrained is entitled to his liberty at once.
There is no reason why his imprisonment should continue
until he can be brought before some remote court or judge,
wherever some person may happen to be who desires to present
a petition in his behalf."

Accordingly, the venue was ordered changed to the proper
county on defendant's motion.

In the *College of Physicians & Surgeons Case*, which, it
is true, was certiorari, and not habeas corpus, but which, for
reasons stated, is clearly analogous, the court, quoting the
statute, which is the same as the present Code Sup. Sec. 3494,
said:

"Under the facts as we have given them, there could be
no doubt that such an action must be brought in Polk county,
for the alleged illegal acts that constitute the cause of action
occurred in that county, and consequently the cause of action

arose there. But it will be seen that the action may be brought in the county where the cause of action or some part thereof arose, and it is thought that some part of this cause of action arose in Lee county. . . . It is urged that the state board of examiners is state-wide, and as much a resident of Lee as of Polk county. Admit this claim, and it does not affect the result. The jurisdiction does not depend on residence, but on the fact of where the cause of action arose. The law provides that the board shall hold meetings in different parts of the state, so as to best accommodate applicants; so that a cause of action is liable to arise in any county of the state, and the jurisdiction is not confined to Polk county, except when the act constituting the cause of action occurred in that county. We conclude that the proper venue of the action is in Polk county.''

*Ware v. Sanders*, 146 Iowa 233, 240, contains nothing inconsistent with these views. All that the case really decides is that the Supreme Court, or a judge thereof, has jurisdiction in habeas corpus matters coextensive with the state. This remark from that opinion may be quoted as showing the appositeness of the *College of Physicians Case:*

''The right to issue the writ of habeas corpus, like that to issue the writ of certiorari, is a very appropriate, if not necessary, attribute of an appellate court under our system of government, which administers justice according to the principles of the common law. While it is often and truly said that habeas corpus cannot properly be made to serve the office of a writ of error, yet the power given to the Supreme Court to entertain such proceedings is a branch or phase of its appellate jurisdiction, and furnishes a direct and summary method by which, in the interest of liberty, the power and authority of an inferior court to render a given order or judgment by which a citizen is restrained of his liberty may be determined without delay. This view of the nature of habeas corpus proceedings in our court of last resort finds support

in numerous precedents. For instance, in *Clarke's Case,* 100 U. S. 399, 25 L. Ed. 715, the petitioner, being in custody under an alleged illegal process issuing from a trial court, applied to Justice Strong of the Supreme Court of the United States, who allowed the writ, but ordered the hearing to be had before the full bench. Objection being made to the jurisdiction, the court said:

" 'It is clear that the writ, whether acted upon by the justice who issued it, or by this court, would in fact require a revision of the action of the circuit court by which the petitioner was committed, and such revision would necessarily be appellate in character. This appellate character of the proceeding attaches to a large portion of cases in habeas corpus, whether issued by a single judge or by a court. The presence of this feature in the case was no objection to the issue of the writ by the associate justice, and is essential to the jurisdiction of this court. The justice who issued it could undoubtedly have disposed of the case himself, though not at the time within his own circuit. A justice of this court can exercise the power of issuing a writ of habeas corpus in any part of the United States where he happens to be. But as the case is one of which this court also has jurisdiction, if the justice who issued the writ found the questions involved to be of great moment and difficulty, and could postpone the case here for the consideration of the whole court without injury to the petitioner, we see no good reason why he should not have taken this course, as he did.'

"*In re Virginia,* 100 U. S. 339, 25 L. Ed. 676, while suggesting in effect that if habeas corpus were to be classed as an original proceeding, there would be doubt of its jurisdiction, the court proceeds to say: 'But the appellate power of this court is broader than its original, and generally—that is, in most cases—it may be said that the issue of a writ of habeas corpus by us, when it is directed to one of our inferior courts, is an exercise of our appellate jurisdiction.' "

See also *Rivers v. Mitchell,* 57 Iowa 193.

Authorities from other jurisdictions support the views herein expressed. *Vide In re Jewett,* 77 Pac. (Kans.) 567; *Ex parte Ellis,* 11 Cal. 222, 225; *In re Doll,* 50 N. W. (Minn.) 607; *Barranger v. Baum,* 30 S. E. (Ga.) 524. *In re Jewett, supra,* contains a learned discussion of the matter and cites many cases in support of the rule. *State ex rel. Durner v. Huegin,* 85 N. W. (Wis.) 1046 (62 L. R. A. 700), is also closely in point. See also Church on Habeas Corpus, Secs. 70-74.

The fact that the legislature has passed the act already referred to is not, in my opinion, an answer to these views. No doubt the holding in this case by the trial court was considered so mischievous and so embarrassing to the superintendents of our state hospitals, that the legislature, in the absence of a definite decision by this court on the subject (notwithstanding intimation in one of our cases already cited by me), concluded to set this matter at rest by framing the act in question, without in any manner intending to say that other actions of like kind, which might prove just as mischievous as this one, might be so brought, or intending in any way by entire inaction in those cases to justify the same. *Rural School Dist. v. Dist. of Kelley,* 120 Iowa 119. If anything is to be inferred from legislative inaction, it is that our pronouncement in *Thompson's Case, supra,* and in *College of Physicians v. Guilbert,* 100 Iowa 213, construing the venue of habeas corpus and certiorari proceedings, was correct, for it did not at any time attempt to meet these interpretations of the statute, by amendatory legislation.

There must be some way of reviewing the action of the district court in these matters, and I think it is either to dismiss or quash the writ or to transfer the case to the proper county for trial. It has been the custom of this court in the past, under its plenary power, to issue writs of habeas corpus and direct that they be heard by some district court judge nearest to the parties. This practice was at one time quite

common, and it was rare indeed that this court or a judge thereof, either at Des Moines or at his residence, heard habeas corpus proceedings, for the very good reason that the parties should not be compelled to travel long distances and be at great expense in order to have a hearing.

It must be remembered that, no matter by whom the action is brought, the applicant is the person who is restrained of his liberty, and the defendant is the person who is exercising the restraint. In this case, both were in Henry county, and no application was made to any judge save Judge Springer, in Clayton county, many hundreds of miles by rail from Mt. Pleasant. Whether plaintiff was cured or not was not within the knowledge of persons living in Clayton county, for it was conclusively adjudicated that when they knew her she was addicted to the drug habit, and should be confined in an asylum. There could be no review of that finding upon habeas corpus. The only question, then, according to the majority of the court, was whether she was cured of her bad habits after she had been taken to Mt. Pleasant, and no one but witnesses who saw her after she had been taken to that place could give any opinion as to her recovery—and that was the only issue in the case—so that not only the parties but the witnesses were at Mt. Pleasant, and all were compelled to go to Clayton county to testify at the trial of the case. It is no wonder that the legislature interfered and, when its attention is called to the holding of the majority in this case, it will doubtless again interfere so that like mischiefs may not be perpetrated, when, for instance, some worthless vagabond of a father calls the mother of his child, who has the rightful possession of it, to defend her custody in the most remote part of the state on allegations that he lives in that remote county; that it will be more convenient for him to try it there and that his witnesses live in that county. At any rate, it is to be hoped that something may be done to forbid such a result.

II. Aside from this, I think the majority have destroyed the most valuable feature of the inebriate law by permitting

and suggesting to every dipsomaniac and every victim of the drug habit how to disregard the parole features of the law and encouraging them to bring as many actions of habeas corpus as they can induce attorneys to commence to secure their release, without any conditions or pledges whatsoever. Under allegations of a cure and without submitting the matter to the superintendent at all, any inmate may now secure a writ of habeas corpus and demand as many trials as he or his friends may be able to finance; for, upon such allegation, a proper court or judge must issue the writ. He has no discretion whatever in the matter, and is subject to a penalty if he does not issue it. The district judges in any of the districts where these hospitals are located will doubtless have their hands full in hearing habeas corpus actions.

Plaintiff was committed as a victim of the morphine habit until cured, not exceeding three years. Her commitment was in April of the year 1911, and she made this application in August of the year 1912. She might have made it, if I understand the position of counsel, at any time after commitment, and as many times within the three years and is as many different districts as she could induce judges to grant her a writ. The defendant had not pronounced her cured, nor did he believe it safe to discharge her at the time this proceeding was commenced. The governing law in the case is found in Secs. 2310-a1 to 2310-a32, inclusive, Code Sup., 1907, relating to the detention and treatment of dipsomaniacs, inebriates and those addicted to the excessive use of narcotics. From these we extract the following:

"Sec. 2310-a1. That the board of control is hereby directed to provide for the detention and treatment of dipsomaniacs, inebriates and persons addicted to the excessive use of morphine or other narcotics, in one or more of the hospitals for the insane at the discretion of said board. Said department thus provided for to be designated as a hospital for inebriates.

"Sec. 2310-a2. That all dipsomaniacs, inebriates and persons addicted to the excessive use of morphine or other narcotics, who shall be citizens of the state of Iowa and residents of the county from which they might be committed to the hospital for inebriates may be brought before the district court or judge of the county where they reside for examination and commitment to said hospital for inebriates. Their examination, trial and commitment shall be governed by the same statutes as now apply to and govern the examination and commitment of incorrigibles to the state industrial school. If it shall be determined by said district court or judge, that such person is addicted to dipsomania, inebriety or to the excessive use of narcotics, he or she shall be committed to such hospital for inebriates, as may be established by the board of control as above provided for. The term of detention and treatment shall be, for the first commitment not less than one, nor more than three years; and for the second commitment not less than two nor more than five years. The governor shall parole a patient on conditions named in the following section.

"Sec. 2310-a3. If after thirty days of such treatment and detention a patient shall appear to be cured, and if the physician in charge and the superintendent of said institution shall so recommend, the governor shall parole said patient, provided that said patient shall pledge himself or herself to refrain from the use of all intoxicating liquors as a beverage, or other narcotics, during the remaining part of his or her term of commitment, and shall avoid the frequenting of places and the association of people tending to lead them back to their old habits of inebriety. And shall send the following report on the first day of every month during term of parole to the governor, which report must be inquired into and approved as correct by the clerk of the district court of the county wherein the patient resides, and said patient shall furnish the clerk of the district court with satisfactory evidence of his sobriety and good habits.

"Report of ——————— to superintendent of hospital for inebriates at —————— Iowa.

"I, —————— being on parole from the hospital for inebriates at —————— Iowa, do hereby certify that I have up to this date, being the first day of ——————, 19—, refrained from the use of all intoxicating liquors as a beverage, and all narcotics of any kind whatsoever, except it be a moderate use of tobacco.

—————————————

—————————————

"I have carefully inquired into the record of —————— as named above and do hereby certify that I believe the statements contained in his above report are true.

—————————————

"Clerk district court of Iowa in and for —————— county, Iowa.

"Dated this —— day of ——————, 19—.

"And if at any time the patient on parole, for any reason fails to make the above report, the sheriff of the county wherein such patient resides shall without further writ or warrant, return said patient at once to the hospital from which he or she has been paroled on receiving notice of such failure from the clerk of the district court of the county wherein the patient resides, or any three reputable citizens thereof. And the patient so returned shall be detained and treated during the full term of his commitment.

"Sec. 2310-a4.   That all statutes of the state providing for the trial, commitment, detention and treatment of incorrigibles sent to industrial schools shall be applicable to trial, detention and treatment of all patients committed under the provisions of this act, except in so far as they may be modified by the provisions of this act.

"Sec. 2310-a12.   On presentation of the application provided for in section six hereof, unless made in person by an inebriate, dipsomaniac, or user to excess of narcotic drugs, the judge shall issue an order, which may be served by any peace

officer, directing him to bring the accused person before him for examination, and on his appearance, unless he demands a formal trial, the judge shall hear any evidence which may be adduced touching the accusation. The accused may be represented by counsel and the judge may, if he deems it necessary, require the county attorney of the county where the hearing is had to attend and assist in such hearing. In case said application be voluntarily or involuntarily made and the said judge shall determine that the accused is a proper person to be committed to said hospital, he shall make an order committing him thereto; otherwise he shall be discharged. The term of detention and treatment shall be until the patient is cured and not exceeding three years. Provided that before a person shall be committed to a state hospital for inebriates satisfactory evidence shall be submitted to the trial court or judge showing that the person committed is not of bad repute or of bad character apart from his or her habit for which the commitment is made and that there is reasonable ground for believing that the person if committed will be cured of such habit, and provided further, that the board of control of state institutions may discharge any person committed to a state hospital under the provisions of this act on the recommendation of the superintendent when satisfied that such person will not receive substantial benefit from further hospital treatment.

"Sec. 2310-a19. Any patient whom the superintendent believes to be cured may be paroled, conditioned on said patient's signing a written pledge agreeing to refrain from the use of all intoxicating liquors as a beverage, and from the use of morphine and cocaine or other narcotic drugs during the term of his commitment, and shall avoid frequenting places and the association of people tending to lead him back to his old habits of inebriety. And said paroled patient must make written reports to the superintendent of said hospital at the beginning of each month on blanks to be furnished the clerk of the district court for that purpose, to the effect that he has not during the month past in any respect violated any

of the terms and conditions of his parole, which reports must be investigated and approved by the clerk of the district court of the county in which the patient resides, who may demand from said paroled patient satisfactory evidence as to the truth of the statement. If, at any time, a patient on parole shall fail to make said report, or shall fail in any respect to fulfill all of the conditions upon which said parole was granted, he may without any further proceeding whatever and on the written order of the superintendent of said hospital be taken and returned to the hospital, there to be detained and treated as provided herein. Said patient so violating his parole may be returned by any peace officer, or by any officer or person whom the superintendent of the hospital may direct so to do.

"Sec. 2310-a22. Females who are dipsomaniacs, inebriates or addicted to the excessive use of morphine, cocaine, or other narcotic drugs, may be committed to a state hospital for the insane to be designated by the board of control, for treatment, and all the provisions of this act, so far as applicable and except as modified by this section, shall apply in such cases and also to the cases of such females as may remain in the hospital for inebriates connected with any state hospital."

There is some confusion and apparent conflict in these provisions, but it is apparent from the original acts that Secs. 2310-a6 to 2310-a31, inclusive, save Sec. 2310-a22, have reference to male inebriates; while Secs. 2310-a1 to 2310-a5, inclusive, have reference to all inebriates, whether male or female, and the latter are either repealed or amended by the special statutes above referred to, applying to male inebriates only. It is a little difficult to harmonize Secs. 2310-a2, 2310-a3 and 2310-a4, and 2310-a12 and 2310-a22, relating to the manner of trial and term of commitment. As to females, the term is until the patient is cured, and not exceeding three years, and the parole provision as to males appears in Sec. 2310-a19.

As I understand it, the provisions of Secs. 2310-a1 to 2310-a4 have reference to proceedings against females, the term

of commitment and conditions for parole. On no other theory may they be harmonized. The males are kept together at the institution at Knoxville, and the females are sent to one or all of the state hospitals for the insane. Females are proceeded against as if they were incorrigibles, or perhaps as males, by reason of Ch. 185, Acts Thirty-fifth General Assembly, and the term of commitment is not less than one, nor more than three years. Provision is made as to the parole of both males and females, and Sec. 2310-a3 relates to females, while Sec. 2310-a19 relates to males; unless perhaps, in view of Secs. 2310-a19, 2310-a22 and 2310-a27, the terms and conditions for parole should now be held to be the same whether the patient be male or female.

While there may be some doubt about this being the true construction of the written laws upon the subject, it being our duty to harmonize them if possible, this opinion is not wholly based upon this construction. If I am right, the case is easy of solution. The trial court on the original hearing should have committed the plaintiff for a definite time, to wit, not less than one or more than three years, and the effect of its sentence was to commit the plaintiff for three years. But the statute we have already quoted makes provisions for a parole after thirty days upon recommendation of the physician and superintendent in charge. This is to be given if, to the officers charged with such duty, the patient should appear to be cured, and then only upon certain pledges being made by the patient, etc. Provision is also made for the return of the patient in case of a violation of the pledge or of any of the statutory conditions.

If this be the law, then it is perfectly manifest that plaintiff in this case was not entitled to her discharge, and that the trial judge had no authority to release the plaintiff or to relieve her from her pledge or the statutory conditions. If he had this power, then he had power to abrogate statutory provisions without any authority.. These provisions were wise ones, made for the benefit, not only of the patient, but also

of the general public. This "ticket of leave" could only be granted upon recommendation of the physician and superintendent, and the conditions imposed were due to the known fact that the drug habit is difficult to cure, and the victim uncertain, even though apparently cured.

No court should assume to exercise this power for the physician and the superintendent, and even if it could, it should demand the pledge required of the patient as a condition to her release. Any other rule would entirely destroy the efficacy of the parole system. There is no claim that the superintendent acted fraudulently or corruptly, or that he refused to grant a parole under proper conditions, and we do not have these facts to consider, even if they might, under any circumstances, be taken into account.

But assuming that Secs. 2310-a2, 2310-a3 and 2310-a4 have been repealed *in toto*, both as to males and females, and that the matter is governed by Secs. 2310-a11, 2310-a12, 2310-a13 and 2310-a19, the commitment is until the patient is cured and not exceeding three years; and there is a provision for a parole at any time when the superintendent believes the patient to be cured, upon certain conditions and pledges. Of course, the superintendent's belief as to cure is the equivalent, in his mind, to "cured"; and the law guards both the patient and the public by providing that, if the patient is released as cured before the expiration of the three years, it must be on certain pledges and conditions. The term is three years; but if the patient is believed by the superintendent to be cured, he or she may be released short of that time upon certain conditions. Whether or not the patient is cured at any given time is a mere question of belief at most. Proof of absolute cure cannot be made. It is not within the power of the human mind to know whether or not one is cured of a given habit until it has been proved by conduct; hence any distinction between an actual cure and belief as to a cure is too refined for discussion. Indeed, there is and can be no difference upon this proposition. The point to it is that the ·

belief as to a cure must be that of a particular individual, to wit, the superintendent of the hospital. None other may substitute himself and grant the parole.

The most that can be said for the conclusions of the trial court in this case is that he believed the plaintiff to be cured; but he released her without requiring any pledges or exacting any reports; and no matter how soon she may resume her old habits, there is no way of getting her back to put in her full time of three years, except by another independent hearing upon the matter. Surely, even if the case should be determined under ·the provisions of the law relating to the hospital at Knoxville, there· was no justification for releasing plaintiff on the belief of the trial judge that she was cured. Any other construction would involve the superintendents in constant litigation; for a patient not desiring to take the pledge or to comply with the provisions of the law could at any time hale the superintendent into court and have the trial judge determine the question as to an apparent cure, and if he believed there was a cure, he would be bound to release the patient, without exacting any pledge, and unconditionally.

If counsel are right in their view, then the provisions as to parole are absolutely nugatory. The physician and superintendent in charge have the best means for knowing whether or not the patient appears to be cured, and it must be assumed that they will act upon this knowledge, and if they believe there has been such cure, they may release short of the full time, and when this is done, a pledge is exacted from the patient, and certain other requirements made. On the other hand, if their judgment is not controlling (in the absence of fraud or want of good faith), then the parole system provided for in this law is worthless; and instead of taking the judgment of experts, the trial court exercises its belief and gives an absolute discharge without any conditions, and this it may do without any limitation whatever as to time. I do not think this is a correct exposition of the law.

It is the judgment of the special tribunal which justifies the discharge, and neither courts nor judges are given power by statute to review that judgment or belief. Counsel quote a provision of law relating to the discharge of insane persons, which does not either expressly or by implication relate to inebriates, dipsomaniacs, or those given to the use of drugs. It relates expressly to insane persons. As to these, there is a complete system of its own. No constitutional right of plaintiff is infringed by the construction we place upon the law. It is somewhat akin to the indeterminate sentence law, which has been sustained by this court, and no court has ever suggested that the parole system, or "ticket of leave plan," violates any constitutional limitation. The indeterminate system is based upon the thought that the prisoner has reformed and that it is safe to turn him loose upon society again; but no one can determine that fact except the board created for that purpose. The commitment of inebriates, male or female, is in effect indeterminate, save that it cannot exceed a certain number of years, and at the expiration of that time, the patient must be released whether cured or not; before that time, it is left to the physician and superintendent (or superintendent alone) to say when they think a cure has been effected, and to release upon certain pledges and conditions. If it should appear that they were wrong in their judgment, or the patient puts herself in the way of temptation or resumes her old habits, or violates any of the conditions under which she has been released, she may be returned to the hospital and made to stay until it appears safe to discharge her, and in any event the maximum term is fixed.

Counsel make too much of the supposed distinction between absolute cure and apparent cure; there is and can be no difference, so far as this proceeding is concerned. If one committed as an inebriate or dipsomaniac may at any time have the question of her cure, or apparent cure, submitted to a district court or judge upon testimony from experts and non-experts, and said court may, if it believes the patient

cured, absolutely discharge her, what becomes of the parole feature of the law? As already intimated, the trial court or judge cannot pronounce absolute cure; at best, the cure is only apparent, and a release made by a court must be final and without power of revocation or recall. The superintendent cannot release on parole short of the three years unless there is an apparent cure. If there is an apparent cure, must the superintendent give a full release, or may he give a full release in one case and a conditional one only in another? If the latter be the case, then how is he to distinguish between a cure and an apparent cure? If the superintendent has difficulty here, it would seem, according to the argument for appellee, that the district court or judge could have none; and if the court should find that the cure was only apparent, he should remand the applicant to the custody of the superintendent again. Would such a finding be in any way binding on the superintendent, and would he be obliged, because of the finding of the trial court or judge, to grant the applicant a parole?

If the court had jurisdiction to make the finding, its judgment is conclusive on the superintendent and a release on parole would be inevitable, no matter what the superintendent might think of the case. What would become of the statute with reference to parole, if this proposition should be affirmed? Again, suppose the court or judge should find, contrary to the conclusion of the superintendent, that the patient was either actually or apparently cured; and it should turn out within a few days that the apparent cure was a mistake. What could be done to rectify the mistake? Appellee's counsel say, "nothing"; that this is one of the incidents of all trials. It is apparent that the law in question was enacted to prevent just such mistakes. If not, then the entire scheme is a failure. Unless there is a further fixed time to serve, there can be no parole, and if there can be no parole when a patient is cured or apparently cured, but only an absolute release, then there is no parole but an absolute

release; so that the legislature made a mistake when it said that dipsomaniacs might be released on parole on certain conditions and upon pledges being exacted.

There is nothing unusual in the "ticket of leave" and parole plans. They are regarded as essential to a humane administration of the law which authorizes the detention of a person accused of crime, or given over to some disease which makes him a fit subject for confinement. Reformation is much the most important element in all our prison and detention schemes, and it is to be regretted if all systems leading to that end must be abandoned, and the matter of release given over to courts and judges alone. Such has never been the thought heretofore, and no good end can be accomplished by wiping out the parole features of this dipsomaniac law. No claim is made in the petition filed for plaintiff in this case that her sentence was not in accord with the law; hence any discussion on that subject is wide of the mark. There is no statute which, in express terms or by necessary implication, gives a dipsomaniac or inebriate the right to disregard the parole law and go directly to the district court or a judge thereof for a release, because he or she believes he is cured; and this is especially true where the patient never asks the superintendent to act or to discharge her on parole or otherwise. And if, as already suggested, such a patient does not have to go to the superintendent for a discharge, either on parole or otherwise, then the parole features of this law are absolutely repealed by judicial interpretation. And in the future, the superintendent, instead of using his judgment as to a cure, must go into court, no matter whether he has been asked for a release or not, and justify his detention of the prisoner. And although he may protest that he does not believe him cured and has better means for knowing that fact than any other person, he must, if the trial judge thinks there has been a cure, absolutely discharge the prisoner.

The difficulties growing out of such a situation may well be apprehended and discipline in the institutions will be im-

possible. Patients committed for these habits are sound in mind and generally have friends always ready to help, and these friends (?) will doubtless make it very unpleasant for the officials of these institutions in the future, if appellee's contention be adopted. The fact that a writ of habeas corpus may be used to release one from custody does not assist the plaintiff at all. Habeas corpus is a remedy to establish rights. If the applicant is not entitled to his absolute release, he is not entitled to this remedy. The question here is not whether habeas corpus will lie, but whether, under the statutes construed as a whole, defendant is wrongfully restraining applicant of her liberty—whether she is entitled to an unconditional release.

The statute is not silent as to who shall determine whether there has been a cure short of the three years, unless we do as appellee suggests: wipe out the parole features of the law. If it does not give the superintendent power to do so, then of course the only remedy is by action in court by habeas corpus. For, without authority in the superintendent to discharge short of three years, there is no power anywhere, save in the courts, and any patient seeking to be discharged within the three years must bring an action in the district court or before a judge to secure a discharge, even if it be conceded on all hands that there is a cure or an apparent cure within a year or so. No one has supposed heretofore that this was the case, and a great burden has been added to those already imposed upon the courts if they must now administer hospitals and inebriate asylums; for, according to the argument for the appellee, no one but a court or judge may discharge an inebriate or dipsomaniac, no matter how firm the belief as to cure. The superintendent of the hospital cannot do so, and neither may the board of control. If the legislature makes any distinction between cure and apparent cure, as applied to the administration of the law now before us, it is not apparent. There is no statute providing for an absolute dis-

charge short of the full term without a parole, as appellee's counsel intimate.

I think the trial court erred in discharging the plaintiff.

I am authorized to say that PRESTON, J., concurs in this dissent in both divisions, and LADD, J., in the second division thereof, but not in the first, concurring with the majority upon this latter proposition.